# WILLIAM PAUL PLUMLEY *v.* STATE OF MARYLAND

[No. 251, September Term, 1967.]

672

*Decided August 13, 1968.*

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Sherman W. West* for appellant.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Edward P. Cames, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant was found guilty by a jury in the Circuit Court for Prince George's County of an attempt to murder John Preston Scott and was sentenced to imprisonment for a term of 15 years.

At the trial Scott testified that he owned and operated an "all night" restaurant known as the Branch Avenue Coffee Shop and that the appellant had worked for him and lived in the residence occupied by Scott and his wife. He discharged the appellant two or three days before 22 December 1965 "for not doing his work properly and taking money from the pool tables." [1] In the early morning hours of 22 December Scott was at his home and saw the appellant drive past the house on two occasions in a maroon and cream colored Ford. Shortly thereafter Scott drove a Cadillac car, owned by his brother-in-law, which car the appellant knew that Scott used, to the restaurant and parked it in back of the building. At 4:00 A.M. Scott saw the Ford at the restaurant. About noon Scott at-

---

1. On cross-examination Scott admitted that he "had heard rumors" that the appellant had "put the finger" on him, informing the police of certain alleged activities, leading to charges and subsequent convictions of receiving stolen property and illegal possession of slot machines. See *Scott v. State,* 1 Md. App. 481.

tempted to leave the restaurant but the Cadillac would not start. He thought the car was out of gas and sent a boy to get some. When the boy returned with the gas he opened the hood to pour some in the carburetor and observed a "ball of wire taped up" and "wires leading from this wire down to a pipe, down by the steering mechanism and another wire was run over and was tied to a bolt on the car water pump." He told the boy who had gotten the gas that he thought it was a bomb and to stay away from it, called the police, and told people in the restaurant that there was a bomb in the car. The appellant came into the restaurant about an hour later and Scott said that when the appellant saw him he "was real nervous and real white" and "was shaken and had a real scared look on his face." This impression of the appellant's reactions was corroborated by other witnesses. There was testimony by a sergeant of the U. S. Army Explosive Ordnance Disposal Group, qualified as an explosive expert, that he dismantled the bomb and that had it exploded the driver of the car would have been killed. Police officers testified that the pipe comprising the bomb was a two-inch pipe coupling which had a notation "1.05" on it. Seventy-five hardware stores in the area were checked and at all of them the price of a similar coupling was ninety cents except at Candey's Hardware Store where it was $1.05. The manager of Candey's testified that a paint shaking machine at his store occasionally spattered paint into the bin containing such couplings, that the appellant had been a customer in the store and that the pipe found in the car was similar to those sold in his store. The police obtained several price tags from the bins which were spattered with paint. The police also found two rolls of wire at the Shanty Restaurant. F. B. I. experts testified that the wire in the bomb came from one of these rolls of wire, that paint particles found on the pipe portion of the bomb matched the paint particles on the price tags and that the powder used in the bomb was Hercules Bullseye Smokeless powder. The manager of a store called the Gun Hospital testified that on 17 December the appellant had purchased two cans of Bullseye gun powder and a can of Unique gun powder. Two electricians testified that about 18 December the appellant asked them where he could get a dynamite cap. Another witness tes-

tified that on a number of occasions the appellant had said he wanted to kill Scott, that he had to kill Scott and had asked for some poison. The appellant finally asked if the witness knew where he could get a dynamite cap. A cab driver testified that he had picked the appellant up about 2:30 P.M. on 21 December and driven him to a rural, wooded area on Tucker Road where the appellant went into the woods and returned with a long, thin bag containing a square object. He then drove him to the Shanty Restaurant and the appellant requested that the driver not show the Tucker Road stop on his manifest. The owner of the Shanty Restaurant saw the appellant standing in front of the restaurant on 21 December about 5:30 P.M. The appellant had a long, thin package, about 4 inches thick and 2 feet long. He drove the appellant to Branch Avenue Coffee Shop and saw the appellant place the package against the back of the shop under a box. A waitress at the coffee shop testified that the appellant had shown affection for Scott's wife. Another waitress at the shop said that the appellant told her that he loved Scott's wife and would go so far as to kill for her. Both testified that about 5 December the appellant had taken a shotgun shell from his pocket, poured out the powder and ignited it saying that a little bit would not hurt anyone but enough of it would blow somebody sky high. Scott testified that several months previously the appellant told him he could make a bomb out of shotgun shells, a pipe and caps. Another witness said that the appellant told him that if he could get some medicine that would kill a man it would be worth some money.

The appellant, testifying on his own behalf, denied any relationship with Mrs. Scott, denied purchasing gun powder at the Gun Hospital, alleging he purchased shotgun shells, denied driving by Scott's home in the early morning of 22 December, denied purchasing the pipe and denied any conversations about killing Scott. He admitted working at the Shanty Restaurant, admitted driving a maroon and cream colored Ford on 21 and 22 December, admitted that he was an automobile mechanic and admitted that he had rather extensive training in making bombs. He said that if he had put the bomb in the car it "would have went off."

I

The State in its opening statement said: "The Defendant, we will then show, was questioned on or about 27 December before Sheriff Jamieson and Detective Sergeant Husk, at which time he indicated that he did in fact know how to make a bomb —." At this point, out of the presence of the jury, defense counsel objected, arguing that the State could not "go into any statement this Defendant made at this time," asking, "what if it is not admissible?" The State said it would prove the statement was voluntarily made, and the court said that it would "deal with it at that time." Defense counsel asked if the court would "then consider (the remarks) improper"—in the event the admission was ruled inadmissible, "would the court grant a mistrial?" and the court said, "We will have to face it at that time."

On the fourth day of the trial the State called the Sheriff in rebuttal and during his testimony he said that he "conversed" with the appellant on 27 December in the interrogation room at the police station. "The conversation dealt with the construction of a bomb and Mr. Plumley, as I recall, drew us a diagram as to the construction of one * * * [H]e told us how one could be made, and indicated that he had the knowledge and ability to build one." That testimony came into evidence without objection.

The appellant contends on appeal that the lower court erred in allowing this testimony in evidence. He concedes that the statements now challenged were not a confession but alleges that they were admissions and urges that they fell "within the doctrines" of *Miranda v. Arizona,* 384 U. S. 436. While it is correct that *Miranda* prohibits the admission of statements by an accused made during a custodial interrogation, be they inculpatory or exculpatory, in the absence of observance of the procedural safeguards enunciated, *Miranda* is not applicable as the appellant's trial commenced before 13 June 1966. *Crumb v. State,* 1 Md. App. 98. Therefore, they were properly admissible if they were voluntarily made. For while an admission which is significantly incriminating but short of a confession, must, like a confession, have been made voluntarily and without improper inducement to be evidence against the accused, the

requirement on the State to show preliminarily to the judge, before its admission, that a confession is voluntary—unless the fact is conceded—does not apply to an admission. *Stewart v. State,* 232 Md. 318, 323-324.[2] Here the admissions came into evidence without objection and there was no allegation below or on appeal that they were the product of force, violence, threats, inducements or promises. Since the appellant did not object to the introduction below on the ground that the admissions were involuntarily made, the question is not properly before us. Md. Rules, 1085; *Gaudio and Bucci v. State,* 1 Md. App. 455, 463. We do not agree that the colloquy between the court and defense counsel (not the same counsel as counsel on appeal) was sufficient to preserve the question. As to the contention that the court should have granted a mistrial, no motion for a mistrial was made at the time of the opening statement by the State (we think it clear that at that time counsel merely inquired of the court if it would grant a mistrial if the admissions were not admitted) nor thereafter (the admissions were admitted without objection). In the absence of a ruling by the court, there is nothing for us to review.

## II and III

Doris Thompson, a waitress at the coffee shop, had given the State a statement in which she said that the day after the appellant was fired she had asked him if he had any idea of killing Scott or of getting someone to do it. The appellant told her he was not going to hurt Scott "but that it would all be over in a certain number of hours or by Monday night." At the trial the State called her as its witness and asked if she had a conversation with the appellant about Scott. She replied, "No, the only—", at which point the State claimed surprise, asked that she be declared a hostile witness and requested permission to cross-examine her. The court said, "I think it is ap-

---

2. Prior to the testimony now challenged, relating to the appellant's knowledge of and ability to construct a bomb, the testimony of the appellant on cross-examination amply demonstrated such knowledge and ability, which he had acquired, according to him, during service with the Marine Corps. At one point he said, "Sir, I could make a bomb if I had the implement, to blow up the whole block."

parent she is either very forgetful or reluctant or something is wrong. I will permit you to cross-examine her." The appellant contends on appeal that these remarks by the court constituted prejudicial error. But he made no objection to them at the time, made no motion to strike them nor did he request that a mistrial be declared. Prior to the remarks by the court the State had claimed surprise out of the presence of the jury and brought the contents of the statement made by her to the police to the attention of the court at which time the court stated that the witness was either reluctant or unwilling to testify. We think that the record was sufficient to show that the State was surprised by the testimony of the witness and that the court did not abuse its discretion in allowing the State to cross-examine her. See *Green v. State,* 243 Md. 154; *Sellman v. State,* 232 Md. 344; *Bruce v. State,* 218 Md. 87; *Meyerson v. State,* 181 Md. 105. We do not think that *Elmer v. State,* 239 Md. 1, relied on by the appellant is apposite. In *Elmer* the State was not taken by surprise but asked the court to declare the witness to be a hostile witness and the court did so in the presence of the jury. We cannot say in the circumstances here that the remarks of the court prejudiced the appellant's right to a fair and impartial trial so as to require reversal of the judgment in the absence of objection.

## IV

The appellant called the Sheriff of Prince George's County to testify on his behalf and adduced evidence that the appellant was working with the Sheriff "in obtaining evidence against Mr. John Scott" and had obtained such evidence. On cross-examination the State's Attorney asked the witness, "Do you have in your budget an assassination fund?" Objection was made to the question and sustained. The appellant contends that the asking of the question was prejudicial error. We do not agree. The appellant's objection to the question was sustained and there was no motion for a mistrial. Therefore, under Maryland Rule 1085 there is nothing for this Court to review. *Halstead v. State,* 4 Md. App. 121. In any event we will not assume prejudice to the appellant and he had not shown that he was prejudiced in the circumstances. *Charles v. State,* 1 Md. App. 222; *Borman v. State,* 1 Md. App. 276.

## V

On direct examination by the State a detective sergeant testified that he and another police officer participated in the investigation of the crime of which the appellant was being tried. He said that he had visited the Candey Hardware Store, had obtained price tags from a bin in which pipe was stored and delivered them to the F. B. I. He also obtained rolls of wire at the Shanty Restaurant and delivered them to the F. B. I. He identified the evidence. On cross-examination he was asked, "Weren't you investigating John Scott also, for having got this bomb?" Objection to the question was sustained. Objection to the further question, "Who did you have under investigation on the 22nd or 23rd for setting this bomb?" was also sustained as "it exceeds the scope." Out of the presence of the jury the court again said that the question exceeded the scope of cross-examination and defense counsel said that he would call the officer as a hostile witness and the court agreed that he could call him as a witness later. The officer was not called by the defense. The appellant contends that the court "unduly limited the defendant's scope of cross-examination." We find no error in the trial court limiting the question on cross-examination to the subject matter covered in the direct testimony of the witness. Ordinarily the scope of cross-examination is a matter within the sound discretion of the trial judge and we cannot say that in this instance the restriction imposed was unsound or prejudicial. *Davis v. State,* 1 Md. App. 581. Further, the appellant failed to call the witness as his own and thus is precluded from presenting the issue. *Holt v. State,* 3 Md. App. 544, 549.

## VI

The appellant objected to the introduction in evidence of the various elements of the bomb on the ground that the State failed to show that they were the same items recovered at the scene of the offense. The record shows that when the army personnel removed the bomb parts from Scott's automobile they were turned over to Detective Sergeant Duncan who transmitted them to F. B. I. Agent Smith. The articles were received back from the F. B. I. and retained by Duncan until introduced in evidence. There was no change, deletion or alteration in the

articles. The appellant claims that the chain of custody was broken when the articles were in the possession of the F. B. I. because other agents than those who examined them may have had access to them. Where the inquiry is into the chain of custody "the question is one of reasonable probability that no tampering occurred." *Breeding v. State,* 220 Md. 193. There was testimony here that no changes were made in the challenged articles except as necessary to test their composition. We find no merit in the contention.

## VII

The appellant contends that the trial court "so badgered and belittled defense counsel during trial as to prejudice the jury against the defendant." The trial consumed four days and produced a transcript of 548 pages. He cites two instances in which defense counsel was refused permission to approach the bench, three instances of "belittling remarks" by the court and two instances in which the court attempted to expedite the trial, the last of which, however, occurred out of the presence of the jury. During the trial counsel was allowed to approach the bench on a number of occasions and we find nothing improper in the refusal to allow him to do so in the two instances stated. We have carefully reviewed the transcript and find nothing to indicate that the trial court was other than impartial or even that it was unduly impatient or brusque. See *Bryant v. State,* 207 Md. 565. The record does not show that the actions and statements of the trial court prejudiced the jury against the appellant so as to deprive him of a fair and impartial trial. Nor was any objection made at the trial to the remarks and actions of the court of which the appellant now complains. Md. Rules, 1085; *Day v. State,* 2 Md. App. 334, 341.

## VIII

It took four days to conclude the evidence in the case. After the jury had been deliberating its verdict for seven hours the lower court, on its own motion, had them returned and asked the Foreman "if you are making any progress at all." The Foreman said, "We can report progress." The court said, over objection timely made:

"Well, I have no desire to rush you into anything,

but as you know, this case has been going on for four days now and ultimately it is going to have to be decided. If it can't be decided by you then another jury is going to have to decide it.

The Court instructs you that you are instructed there are many cases in which absolute certaintly cannot be expected, although the verdict must be the verdict of each individual juror as the result of his own convictions and not a mere acquiescence in the conclusion of his fellows. Each one of you should examine the questions submitted with candor and with the proper regard in deference to the opinions of others. It is your duty to decide the case, if you can conscientiously do so.

And you should listen with a disposition to be convinced to each other's arguments, if your views are contrary to those of the vast majority. You should consider whether your views, which make no impression on the minds of so many, equally intelligent jurors, are correct.

So, in light of these additional instructions, you will return to the jury room and deliberate further to this matter at this time."

The appellant contends that the court erred in giving the additional charge.

With the exception of the first paragraph, the instructions given by the court constitute the "Allen charge," so called because it was approved by the Supreme Court in *Allen v. United States,* 164 U. S. 492. Its propriety has been established in Maryland in both civil and criminal cases. *Leupen v. Lackey,*

---

**3.** *Allen* was decided 7 December 1896. In more recent times it has been subject to some criticism on the basis that it provides too great a possibility of a minority of the jury being in effect coerced by the court to abandon their view. See, *State v. Randell,* 137 Mont. 534, 353 P. 2d 1054 (1960); *State v. Thomas,* 86 Ariz. 161, 342 P. 2d 197 (1959); note, 53 Va. L. Rev. 123 (1967); note, 31 U. Chi. L. Rev. 386 (1964).

248 Md. 19; *Stewart v. State,* 4 Md. App. 565.[3] In *Leupen* the Court warned, at p. 25:

> "It must not be supposed that an Allen charge is proper in every case. There well may be facts and circumstances in a given case which would make such a charge either inadvisable or require the trial judge to exercise great care and restraint in presenting it to the jury."

Considering the length of the trial and the length of time the jury had been deliberating, we cannot say that the actual charge was improper in the instant case. But there remains the consideration of whether the remarks of the trial court immediately preceding the actual charge were proper. In *Leupen* the court stated, at p. 25, that it would be well for the lower court in any case to keep in mind the language found in 1 Branson's *Instructions to Juries* (3rd Ed. A. Reid 1960 Replacement) and it quoted:

> "The trial judge may advise an unagreed jury of the importance of their reaching a verdict, if they can do so without surrendering their conscientious convictions. But he cannot go beyond that and say anything to the prejudice of either party. There is no prescribed language that he must use in this connection. What he may with propriety say must in a large measure be left to his good judgment. But as the exclusive right to agree or not to agree rests with the jury, the judge must not by threat or entreaty attempt to coerce a verdict or to exert his authority to force an agreement; nor must he under any circumstances or in any manner indicate the character of verdict that the jury should return.
>
> While there must be nothing in the conduct of the trial judge toward the jury savoring of undue pressure or coercion to reach a verdict, when the jury return into court and announce their failure to agree, the court may impress upon them the importance of

agreeing, urge them to listen to argument and sacrifice the pride of personal opinion, and he may send them back for further deliberation until such time as it becomes apparent that hope of an agreement is futile."
*Id.* at 149-50.

So such language as the jury has "got to reach a verdict"[4] and "this court expects a verdict"[5] has been held to savor of coercion or undue pressure.[6] In the instant case, considering the language employed in the actual charge, we do not think that the introductory remarks of the court were to the prejudice of the appellant and we do not construe them as an attempt to coerce a verdict, to force an agreement, or as an indication of the character of verdict that the jury should return. We find no error requiring reversal with respect to the additional charge.

## IX and X

The appellant contends that the conviction "was contrary to and against the weight of the evidence." This Court does not inquire into and measure the weight of the evidence in jury trials, *Thompson v. State,* 4 Md. App. 31, or in non-jury trials, *Trout v. State,* 3 Md. App. 259. And in jury trials this Court will not review the sufficiency of the evidence in the absence of a motion for judgment of acquittal. *Culver v. State,* 1 Md. App. 406; *Quinn v. State,* 1 Md. App. 373. At the close of the evidence offered by the State, the appellant moved for judgment of acquittal which was denied. He then offered evidence and by so doing withdrew that motion. Md. Rules, 755b. The record does not disclose that a motion for judgment of acquittal was made at the close of all the evidence. Therefore the question of the sufficiency of the evidence is not before us. *Jason v. State,* 1 Md. App 136. In any event the test in reviewing the sufficiency of the evidence in a jury case when the question is

---

4. *Jenkins v. United States,* 380 U. S. 445.

5. *Orr v. State,* 40 Ala. App. 45, 111 So. 2d 627 (1958).

6. See also *United States v. Harris,* —— F. 2d ——, 2 Cr. L. Reptr. 2506; *Powell v. United States,* 297 F. 2d 318 (5th Cir. 1962); *United States v. Rogers,* 289 F. 2d 433 (4th Cir. 1961).

properly preserved is whether any relevant evidence which could have sustained the conviction was given to the jury. *Tillery v. State,* 3 Md. App. 142. We think that the evidence here met this test.[7]

*Judgment affirmed.*

---

7. The original appeal noted by the appellant was dismissed by order of this Court on 31 August 1967 upon motion by the State under Md. Rule, 1035b4. The appeal here decided was granted by order of 27 September 1967 of the Circuit Court for Prince George's County as a belated appeal under post conviction procedures.