731 P.2d 804

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Norman Homer CLAY,
Defendant-Appellant.**

**No. 16188.**

Court of Appeals of Idaho.

Jan. 14, 1987.
Petition for Review Denied
March 30, 1987.

Alan D. Wilson, Mountain Home, for defendant-appellant.

Jim Jones, Atty. Gen. by Lynn E. Thomas, Sol. Gen., and Steven J. Schuster, Deputy Atty. Gen. (argued), Boise, for plaintiff-respondent.

BURNETT, Judge.

This is an appeal from a judgment of conviction on a charge of rape. The primary issue is whether the trial judge unduly pressured the jury to return a verdict after a deadlock was reported. We hold that he did.

The facts are straightforward. The state charged Norman H. Clay with raping a woman who was visiting the town of Atlanta, Idaho, during a community festival known as "Atlanta Daze." The woman testified that Clay entered a cabin where she was sleeping and that he forced her to engage in intercourse. The prosecutor also called other women to testify, over objection, that Clay had made "passes" at them earlier in the day. Clay admitted making such "passes" and having intercourse with the alleged victim. However, he contended that he met her at a local tavern during the festival, that she invited him to her cabin, and that the intercourse was consensual. Extrinsic evidence regarding any use of force was conflicting and inconclusive.

The case was tried twice. The first trial ended when a jury, after deliberating for ten hours, declared itself to be "hopelessly divided." A mistrial was declared. The second trial spanned five working days. On the last day, court convened at 9:00 a.m. Final testimony, jury instructions and closing arguments were completed by 3:00 p.m. The jury retired to deliberate. Some eleven hours later, at 2:14 a.m., the jury reported that it was "deadlocked ... 7 to 5." Despite an objection by Clay's counsel, the trial judge gave what is commonly called a "dynamite" instruction, urging the jurors to reach a verdict and directing them to continue their deliberations. They returned to the jury room at 2:19 a.m., remaining there until 2:55 a.m. At that time the jurors asked to hear the testimony of Clay and of the alleged victim again. The court reporter read the testimony aloud from his stenographic notes. This process, including two rest breaks, lasted until 5:40 a.m. The jury then retired once more. At 6:26 a.m.—more than fifteen hours after deliberations had begun, and more than twenty-one hours after court had convened the previous morning—the jury reached a verdict, finding Clay guilty as charged. Judgment of conviction was entered and this appeal followed.

In Part I of our opinion, we examine the evolution of guidelines for dealing with deadlocked juries. We then apply those guidelines to this case, concluding that the judgment must be set aside. In Part II we offer guidance on remand concerning the admissibility of testimony about Clay's "passes" at other women. Although Clay has raised additional issues on appeal, we do not address them because they appear unlikely to arise in a similar context if the case is tried again.

## I

■ ■ Jury verdicts occupy an exalted place in our criminal justice system. When a properly instructed jury makes a finding of guilt upon admissible evidence, its finding must be upheld if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis original). *See also State v. Filson,* 101 Idaho 381, 386, 613 P.2d 938, 943 (1980); *State v. Decker,* 108 Idaho 683, 701 P.2d 303 (Ct.App.1985). An appellate court may not substitute its judgment for that of the jury regarding the credibility of witnesses, the weight of their testimony, or the reasonable inferences to be drawn from the evidence. *State v. Campbell,* 104 Idaho 705, 718–19, 662 P.2d 1149, 1162–63 (Ct.App.1983). This vast deference to jury verdicts can be justified only if the integrity of the jury deliberation process is scrupulously maintained. Moreover, the constitutional guaranty of due process demands that an accused person receive a fair and impartial trial. This guaranty is violated if jury deliberations are tainted by undue pressue. *State v. Aragon,* 89 N.M. 91, 547 P.2d 574 (1976); *See generally* Comment, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge,* 53 VA.L.REV. 123 (1967) (hereinafter "The Hung Jury").

The opportunity to exert such pressure is presented when a jury, after long deliberation, reports a deadlock. During the nineteenth century, the deadlocked jury was regarded by some courts as an evil to be combatted by psychological or even physical coercion. *Id. See also* Note, *Deadlocked Juries and Dynamite: A Critical Look at the "Allen" Charge,* 31 U.CHI.L. REV. 386 (1964). In this historical milieu, the United States Supreme Court approved the use of an instruction that directed a deadlocked jury to continue deliberating and exhorted jurors holding a minority view to reconsider their position. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). This instruction, and others like it, eventually earned the appellation "dynamite" because they proved to be effective in "blasting" verdicts out of potentially hung juries.

The past two decades have brought greater sensitivity to the problem of jury deadlock. Declaring that individual jurors must not be pressured to abandon their honest beliefs, many federal and state courts have limited or abolished the *Allen* instruction. *See, e.g., United States v. Thomas,* 449 F.2d 1177 (D.C.Cir.1971); *United States v. Fioravanti,* 412 F.2d 407 (3rd Cir.1969), *cert. denied sub nom,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States v. Brown,* 411 F.2d 930 (7th Cir.1969), *cert. denied,* 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970); *Fields v. State,* 487 P.2d 831 (Alaska 1971); *People v. Gainer,* 19 Cal.3d 835, 139 Cal.Rptr. 861, 566 P.2d 997 (1977); *State v. Nicholson,* 315 So.2d 639 (La.1975); *State v. White,* 285 A.2d 832 (Me.1972); *State v. Martin,* 297 Minn. 359, 211 N.W.2d 765 (1973); *State v. Marsh,* 260 Or. 416, 490 P.2d 491 (1971), *cert. denied sub nom,* 406 U.S. 974, 92 S.Ct. 2420, 32 L.Ed.2d 674 (1972). The demise of *Allen* was acknowledged years ago by at least one member of the Supreme Court itself: "Nor do we circulate the 'Allen charge' to the new judges as I used to do when heading up the criminal division in the Department of Justice. Allen is dead and we do not believe in dead law." Clark, *Progress of Project Effective Justice—A Report on the Joint Committee,* 47 J.AM. JUD.SOC'Y 88, 90 (1963).

The trend away from exerting *Allen*-type pressure on juries has been accompanied by increased recognition that a deadlocked jury does not represent a failure of the criminal justice system. To the contrary, it is a natural by-product of the unanimous verdict requirement.

[S]ome cases will inevitably present close factual questions on which twelve people cannot agree. Where such is the case the unanimous verdict requirement and the ultimate acceptance of the jury's fail-

ure to reach accord protect the accused from conviction on the basis of evidence so close as to permit ... real and reasonable differences of opinion. In our system this is a desirable result. Despite the fact that each trial which ends in a hung jury may appear to be an exercise in futility and may create understandable judicial frustration, it should be remembered that a hung jury is only undesirable where the hanging jurors simply refuse to join in conscientious collective deliberations in an honest effort to reach a verdict.

"The Hung Jury," *supra*, at 145–46.

Where jurors honestly have tried and failed to reach a verdict, the prosecutor undoubtedly will reexamine the case. In some instances, a new trial may be requested; in others, the jury's inability to agree may be allowed to stand as the last official word on the issue of the defendant's guilt. Thus, a deadlock does not always necessitate an investment of additional time and money in trying the case to another jury. In any event, whether or not the case is retried, the honestly deadlocked jury has made a contribution to the administration of justice. *People v. Gainer, supra.*

The American Bar Association has recommended that a deadlocked jury be given an instruction containing neither an *Allen* charge nor any suggestion that the system would be disserved by honest failure to reach a verdict.[1] The Idaho Supreme Court has approved a pattern jury instruction consistent with this recommendation. Adapted for use in a criminal case, IDJI 142 is set forth as follows:

## REQUESTING THE JURY TO DELIBERATE FURTHER

Members of the Jury: In order to return a verdict, it is necessary that [all members] of the jury agree. Your verdict must represent the considered judgment of each juror agreeing to it.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

Our Supreme Court has called attention to the availability of this instruction in a criminal case. *See State v. Silcox*, 103 Idaho 483, 485, 650 P.2d 625, 627 (1982) (referring

---

1. The ABA's recommendations are set forth in its STANDARDS RELATING TO TRIAL BY JURY § 5.4 (1968), as follows:

   5.4 *Length of deliberations; deadlocked jury.*

   (a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

   (i) that in order to return a verdict, each juror must agree thereto;

   (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

   (iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

   (iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

   (v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

   (b) *If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.*

   (c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement. [Emphasis added.]

to identical former IDJI 131). Although the pattern instruction is free of any coercive language, judges still are advised to use it with care and to avoid unduly pressuring the jury. *See* comment to IDJI 142; IDAHO TRIAL JUDGES MANUAL § 7.63 (referring to identical former IDJI 131).

Since 1974, IDJI 142 and its predecessor have served as the authoritative guideline in Idaho for instructing deadlocked juries. The pattern instruction reflects the views expressed by our Supreme Court in two 1971 cases. In *State v. Brown*, 94 Idaho 352, 487 P.2d 946 (1971), and in *State v. Bailey*, 94 Idaho 285, 486 P.2d 998 (1971), the Court upheld instructions which, like IDJI 142, contained no *Allen* charge and made no explicit reference to the cost or inconvenience of retrying the case if a verdict were not reached.[2] IDJI 142 clearly embodies the policy of this state and should be used by Idaho trial courts.

■ Judges may deviate from the pattern instruction if a different instruction would "more adequately, accurately or clearly state the law." I.R.C.P. 51(a)(2). In the present case, the judge employed the following language when the jury reported a deadlock at 2:14 a.m.:

I realize that the hour is very late and that you have been deliberating almost 11 hours. *However, in view of the time and expense that has been invested in preparing the case and presenting it to you, by both parties, and if it is presented to another jury, there would be the same evidence, law, and arguments as presented to you; I feel I must ask you to return to the jury room and keep trying;* and hopefully you will be able to reach a verdict in this case. I remind you that you must consult with one another and deliberate with a view of reaching an agreement, if you can do so without violence to individual judgement. That each of you must de-

cide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your continued deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. If you are still unable to reach a unanimous verdict after trying further, you can notify the bailiff and we will discharge you. Please return to the jury room and try some more.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case. [Emphasis added.]

This instruction deviated from IDJI 142 in the language emphasized above. It told the jury to consider the "time and expense ... invested" in preparing and presenting the case. It also informed them that if "another jury" heard the case, "the same evidence, law and arguments" would be presented. The inescapable message was that the criminal justice system would be frustrated if the jury failed to return a verdict. We fail to see how this deviation from IDJI 142 "more adequately, accurately or clearly state[d] the law." Indeed, we think it misstated the law. As noted earlier, when a jury is unable to agree on a verdict, the case may or may not be retried. In any event, an honestly deadlocked jury has not disserved the system.

■ The judge's choice of language was, of course, coupled with his act of directing the jury to continue deliberating after 2:14 a.m. Whether this confluence of words and action unduly pressured the jury turns upon a review of "the totality of circumstances." *State v. Byerly*, 109 Idaho 242, 245, 706 P.2d 1353, 1356 (Ct.App.1985);

**2.** The instructions in *Bailey* and *Brown* were virtually identical. The text is set forth in *Bailey*, 94 Idaho at 291 n. 4, 486 P.2d at 1004 n. 4. As readers of *Bailey* will note, the instruction arguably contained an implicit reference to cost and inconvenience of a new trial. It informed

jurors that they would "make a definite contribution to efficient judicial administration" if they reached a verdict. Although this reference might seem innocuous, we think our Supreme Court later chose wisely not to include such language in IDJI 131 and 142.

*People v. Gainer, supra.* Our review encompasses (1) the likely effect of the instruction itself; (2) the length of deliberations, with particular attention to deliberations following the instruction; and (3) other indicia of pressure upon the jury. *United States v. Foster,* 711 F.2d 871 (9th Cir. 1983).

We think the jurors in this case must have been influenced by the judge's references to "time and expense" and to "another jury." The jurors were aware that the case had been tried once previously. A witness mentioned the prior trial during his testimony, prompting Clay's counsel to move unsuccessfully for a mistrial. Regardless of whether this event warranted a mistrial, it clearly added special urgency to the judge's subsequent reference to the potential burden of yet another trial. Moreover, "[c]onsideration of expense may have an incalculably coercive effect on jurors reasonably concerned about the spiraling costs of government." *People v. Barraza,* 23 Cal.3d 675, 153 Cal.Rptr. 459, 464, 591 P.2d 947, 952 (1979).

As our chronology of events has indicated, the jury received the case at 3:00 p.m. and reached a verdict more than fifteen hours later, at 6:26 the next morning. Of this total period, approximately eleven hours were consumed by deliberations before the "7 to 5" deadlock was announced at 2:14 a.m. After the jurors were told to continue, they deliberated for 36 minutes, then listened to the court reporter read testimony, and then deliberated an additional 46 minutes until agreeing on a verdict. Thus, the postinstruction deliberations actually consisted of 82 minutes, compared to the preinstruction period of eleven hours. Although not conclusive, these time frames tend to show that the judge's instruction affected the jury's decision-making process.

The time frames also depict another source of undue pressure on the jury—fatigue. When the jurors finally rendered a verdict, they had been in court more than twenty-one hours and they had gone without sleep for an even longer period. Such prolonged deprivation of a basic human need impugns the judicial process and erodes confidence in the reliability of the jury's decision. Common sense indicates that as the night wore on, and as morning arrived, the jurors' capacity to make sound individual judgments and then to participate meaningfully in a collegial decision must have decreased. At the same time, their motivation to "get it over with" must have increased.

This simply is no way for any group to make an important decision, much less for a jury to determine guilt or innocence on a criminal charge punishable by lengthy imprisonment. Nor is such an exhausting procedure necessary. Concededly, jurors in a criminal case must be kept together once deliberations have begun.[3] But the jury may recess for the evening and receive comfortable accommodations at a hotel or motel. Idaho Code § 19–2202 mandates the sheriff to provide "suitable and sufficient food and lodging" for jurors. During the first trial in this case, the judge offered to lodge the jurors in a motel after their deliberations had become deadlocked late at night. This offer was not repeated to the jury during the second trial.

In the vast majority of cases involving some form of "dynamite" instruction, the jury has been allowed to recess for the evening. *See, e.g., United States v. Foster,* 711 F.2d 871 (9th Cir.1983) (jury given *Allen* instruction in late afternoon and then excused for the day); *United States v. Hooten,* 662 F.2d 628 (9th Cir.1981) (jury

---

**3.** Idaho Code § 19–2126 provides, by negative inference, that jurors may not separate after the case has been submitted. It states that *"before* the submission of the cause," members of the jury may "be permitted to separate...." (Emphasis added.) Rule 24(c)(3), I.C.R., also distinguishes between the presubmission and postsubmission management of alternate jurors. A Supreme Court committee recently has recommended that the statute and rule be amended to allow postsubmission separation of jurors in criminal cases. *See* REPORT AND RECOMMENDATIONS, SPECIAL COMMITTEE ON SELECTION OF A PARTICULAR JURY (Idaho Supreme Court, 1986).

recessed each afternoon and resumed deliberations the next morning); *United States v. Beattie,* 613 F.2d 762 (9th Cir.1980) (jury recessed at 4:40 p.m.); *People v. Barraza,* 23 Cal.3d 675, 153 Cal.Rptr. 459, 591 P.2d 947 (1979) (jury recessed in "late afternoon"); *People v. Gainer,* 19 Cal.3d 835, 139 Cal.Rptr. 861, 566 P.2d 997 (1977) (jury excused at 4:40 and 5:05 p.m. on consecutive days of trial). *See also State v. Byerly, supra* (judge requested Idaho jury not to deliberate past 12:30 a.m.). In contrast, the Idaho jury in *State v. Bailey* was allowed to deliberate until 2:05 a.m. As we have noted, however, the jury in *Bailey* received a distinctly less coercive instruction than the one given in this case.

The most salient exception to the Idaho policy of avoiding pressure on juries is found in *State v. Silcox, supra.* At first glance, *Silcox* appears markedly similar to the case now before us. The jurors in *Silcox* began to deliberate at 8:40 p.m. They reached a deadlock at 3:46 a.m. and were given an instruction closely resembling the one given here.[4] The jury returned a verdict of guilt at 6:00 a.m. A majority of our Supreme Court found no reversible error.

The trial judge in *Silcox* also presided over the instant case. He might well have assumed that his actions were endorsed and guided by the Supreme Court's decision in *Silcox.* However, we believe the cases are distinguishable in several important respects. First, there had been no prior trial in *Silcox.* Here, as we have seen, the jurors were aware that the case had been tried before, and they must have been concerned about the prospect of a third trial. Second, the resources for accommodating a jury overnight were extremely limited in *Silcox.* That case was tried in Idaho City, a town with only 300 residents. The instant case was tried in Mountain Home, a city of 7,540 people.[5] We deem it obvious that the court would have encountered far greater difficulty arranging suitable accommodations for a sequestered jury, late at night and on short notice, in Idaho City than in Mountain Home. Third, the time frames in *Silcox* do not illustrate the impact of pressure on the jury as discernibly as they do here. The *Silcox* jury deliberated seven hours before deadlock and approximately two and one-half hours after being instructed to continue. In this case, it will be recalled that the figures were eleven hours and 82 minutes, respectively. Finally, the Supreme Court in *Silcox* carefully signaled that its decision was not intended to provide general guidance for other cases. The Court invited attention to Idaho's pattern instruction and said that the instruction actually given "should not be considered as a model as to either form or procedure...." 103 Idaho at 484, 650 P.2d at 626. The court further noted that the judge in *Silcox* consulted with counsel after the deadlock and then gave the instruction in question without any objection. In the present case, a timely objection was made. In sum, we believe that *Silcox* was a product of unique circumstances. It did not represent a lasting

---

**4.** The jury in *Silcox* was told:

Well, I realize, ladies and gentlemen, that the hour is very late and that you have been deliberating about 7 hours; however, *because of the tremendous expense of retrying the case and the fact that I just don't see how another jury would have any different evidence, any different law, any different arguments, or how the case could be presented any differently to them, and because of the time and effort that's been invested so far,* I feel I must ask you to return and keep trying, and hopefully you will be able to reach a verdict. If you cannot, why, then, you can notify the bailiff and we will discharge you.

So, with that, I would ask you to return to the jury room and try, try some more. [Emphasis added.]

103 Idaho at 484, 650 P.2d at 626.

**5.** The population data are derived from the 1980 United States Census. An Idaho appellate court may take judicial notice of the population of cities in this state. *Independent Gas & Oil Co. v. T.B. Smith Co.,* 51 Idaho 710, 10 P.2d 317 (1932). *See also* I.R.E. 201; *Braddock v. Family Finance Corp.,* 95 Idaho 256, 261, 506 P.2d 824, 829 (1973) (Shepard, J., dissenting on other grounds).

departure from Idaho's established policy of avoiding pressure on juries.[6]

■ With due respect to the capable trial judge, we conclude that the court in this case erred by exerting undue pressure upon the jury to return a verdict. We further conclude that the error requires reversal. Even if this kind of instructional error could be subjected to a harmless error analysis—a question we do not decide today—we would be unable to find beyond a reasonable doubt that the verdict was unaffected by the error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Palin*, 106 Idaho 70, 675 P.2d 49 (Ct.App.1983). The trial, in essence, was a credibility contest between the accused and the alleged victim. A prior jury had been unable to reach a decision. After the second jury deliberated eleven hours, at least five and perhaps seven jurors favored acquittal.[7] We entertain a reasonable doubt as to whether all jurors would have returned a verdict of guilt but for the pressure exerted upon them. The judgment of conviction must be set aside.

## II

For possible guidance on remand, we now turn to the testimony concerning "passes" made by Clay toward other women on the day of the alleged rape. The first witness testified that Clay approached her at a crowded local tavern, gave her a "French kiss" and exclaimed, "God you're beautiful ... [L]et's go for a walk." The woman left the bar. Clay did not pursue her. The second witness testified that while in another bar, she observed Clay

approach one of her friends and put his arms around the woman's waist. The witness interceded and requested that Clay leave her friend alone. He complied. A third witness stated that she and her friends were invited by Clay's wife to pitch tents in the Clays' yard. Shortly thereafter, Clay asked the witness if she would go with him to his trailer and help carry items to an auction taking place during the festival. She agreed and followed Clay. Once inside the trailer, Clay grabbed her and began kissing her. When the woman protested, Clay released her and she left the trailer hurriedly. The witness further testified that Clay apologized later in the day for his behavior.

■ The admissibility of testimony concerning prior bad acts has long troubled appellate courts. Such evidence invariably is prejudicial. Often it is not significantly probative of material issues at trial. In general, evidence of other bad acts is inadmissible to show that the accused committed the crime charged. Exceptions to this general rule are recognized when the evidence is relevant to a material issue such as (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, (5) identity of the person charged with commission of the crime on trial, or (6) another similar issue. *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978). If, and only if, the evidence is relevant to a material issue, it may be admitted—unless the trial judge finds that its probative value

**6.** We acknowledge that *Silcox* cited two cases from other jurisdictions, *Hodges v. United States*, 408 F.2d 543 (8th Cir.1969), and *Plumley v. State*, 4 Md.App. 671, 245 A.2d 111 (Md.Ct. Spec.App.1968), holding that references to time, expense and another jury were not reversible error. However, in both cases, *Allen*–type charges were upheld. It is not surprising that courts adhering to *Allen* would fail to find fault with references to perceived burdens created by hung juries. Moreover, those cases are factually distinguishable from the case before us. In neither *Hodges* nor *Plumley* is there any indication that the jury was required to deliberate late at night or during early morning hours. To the

contrary, the court in *Hodges* emphasized that the jury had recessed at 6:10 p.m. and at 5:45 p.m. on two days of deliberations.

**7.** In a posttrial affidavit, defense counsel reported an interview with one of the jurors who said that the deadlock occurred with seven voting for acquittal, five for conviction. However, the affidavit is hearsay, and we do not rely on it. Regardless of which way the jury was divided, the shift toward conviction during the early morning hours indicated a substantial number of vote changes.

likely would be outweighed by its unfair prejudicial impact. I.R.E. 403; *State v. Matthews,* 108 Idaho 482, 700 P.2d 104 (Ct.App.1985).

In sex crime cases, we have upheld the admission of evidence showing prior criminal sexual misconduct by the defendant toward the victim. *See State v. Maylett,* 108 Idaho 671, 701 P.2d 291 (Ct.App.1985); *State v. Boothe,* 103 Idaho 187, 646 P.2d 429 (Ct.App.1982). We also have allowed testimony of prior criminal sexual acts of the defendant with persons other than the victim, where the evidence has been found relevant to such issues as a common modus operandi, intent or motive. *See State v. Martinez,* 109 Idaho 61, 704 P.2d 965 (Ct. App.1985); *State v. Greensweig,* 102 Idaho 794, 641 P.2d 340 (Ct.App.1982). *But see State v. Roach,* 109 Idaho 973, 712 P.2d 674 (Ct.App.1985).

This case is different. The testimony concerning "passes" at other women would be relevant, if at all, only to show that Clay had a lustful disposition and was intensely interested in having sexual relations with a woman on the day in question. But Clay's interest in sex was not at issue in the case. He never disputed engaging in intercourse with the alleged victim. He admitted it. The only material issue was whether the intercourse had been consensual or forced. The testimony in question had little or no tendency to prove that force had been used. Thus, although these prior acts were closely proximate in time and place to the alleged offense, we think their relevancy was marginal at best.

Our reasoning is similar to that expressed by the Oregon Court of Appeals in *State v. Urlacher,* 42 Or.App. 141, 600 P.2d 445 (1979). There, as here, the material issue was consent. The trial court in *Urlacher* granted the defendant's motion to exclude testimony of two prosecution witnesses who sought to describe the defendant's aggressive sexual advances toward them on the day of, and the day prior to, the alleged rape of another woman. The first witness would have testified that while she was in the defendant's apartment, the defendant attempted to unfasten her pants and to fondle her. When she resisted, he stopped and apologized. The second witness would have testified that the defendant acted similarly toward her and that when she became angry, he ceased his advances and drove her home. Shortly thereafter, the defendant picked up the alleged rape victim. When the trial court held such evidence inadmissible, the state appealed.

The Oregon appellate court held that the evidence did not tend to disprove the defendant's defense of consent, nor did it show a state of mind that was at issue in the case. The court noted that the evidence would contribute negligibly to an understanding of what transpired between the defendant and the prosecutrix:

> [T]he proffered evidence is peripheral and its tendency to prove that which it is offered to prove is weak. Whatever minimal probative value may inhere in the testimony of the two women whom the defendant assaulted is outweighed by its tendency to prejudice the jury against defendant or to direct the jury's consideration away from the act charged.

*Id.* 600 P.2d at 446. *See also State v. Davis,* 54 Or.App. 133, 634 P.2d 279 (1981). A similar observation could be made in the present case. The testimony about "passes" toward other women would contribute negligibly to an understanding of whether Clay engaged in intercourse with the alleged victim by consent or by force. Conversely, the evidence would carry a high risk of unfair prejudice, portraying Clay as an undesirable character—a married man crudely seeking sexual liaisons with other women.

Because we cannot foresee the exact context in which such evidence might be offered at another trial, and because the task of weighing probative value against unfair prejudice is committed in the first instance to the trial court, we will not hold in advance that the evidence would be inadmissible if offered again. However, we caution the trial judge that the evidence should not be admitted unless the prosecutor makes a

stronger showing of probative value than the present record contains.

The judgment of conviction is reversed and the case is remanded for further proceedings consistent with this opinion.

WALTERS, C.J., and SWANSTROM, J., concur.