820 P.2d 665

**STATE of Idaho, Plaintiff–Respondent**

v.

**Paul Ezra RHOADES, Defendant–Appellant.**

**Nos. 17521, 18285.**

Supreme Court of Idaho,
Idaho Falls, September 1990 Term.

Sept. 12, 1991.

Rehearing Denied Sept. 12, 1991.

**798**

David N. Parmenter, Blackfoot, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas (argued), Sol. Gen., Boise, for plaintiff-respondent.

McDEVITT, Justice.

This case arises from the murder of Stacy Baldwin. Paul Ezra Rhoades has been convicted in three separate murder cases. For the murders of Susan Michelbacher and Stacy Baldwin, Rhoades was sentenced to death, and for the murder of Nolan Haddon he received an indeterminate life sentence based on a conditional plea.

On February 28, 1987, Stacy Baldwin was abducted from the convenience store where she was working near Blackfoot, Idaho. She was then taken to a secluded location and shot several times. She died approximately an hour and a half later.

The issues presented in this appeal are:

I. Whether a prejudicial statement made by one juror to another should have been grounds for a mistrial.

II. Whether the legislative abolition of the defense of mental condition in criminal cases violates the Idaho or United States Constitutions.

III. Whether the trial court's failure to make a pretrial ruling on the constitutionality of the statutory abolition of the insanity defense was in error.

IV. Whether the prosecution's failure to turn over exculpatory evidence constituted reversible error.

V. Whether the trial court should have excluded testimony by a jailhouse informant.

VI. Whether inculpatory statements made by Rhoades to the police should have been suppressed.

VII. Whether accelerated post conviction procedures in capital cases are unconstitutional.

VIII. Whether the court erroneously considered victim impact statements.

IX. Whether the death penalty was properly imposed.

X. Whether the court erred in compelling a defense expert to prepare a written report or submit to an interview by the prosecutor before testifying.

XI. Whether the trial court abused its discretion in denying a motion for continuance to allow for the attendance of the defense's forensic expert.

XII. Proportionality of the sentence imposed.

I.

PREJUDICIAL STATEMENT BY JUROR

▪ Rhoades asserts that the trial court should have granted a mistrial because of a prejudicial statement allegedly made by one juror to another. After the jury was selected, a deputy sheriff from Bingham County came forward and signed a statement stating that he overheard one juror make a prejudicial remark to another juror

during the jury selection process. The deputy testified in a special proceeding outside the presence of the jury, that during a recess he was six to eight feet away from the jury box when he heard a juror say, "you can just look at him and tell that he's guilty."

Upon learning of this, the trial court undertook an extensive inquiry into the matter. Counsel was permitted to examine the deputy sheriff at length. Several questions were raised concerning the accuracy of his perceptions. The supposed remark did not mention the defendant's name, and the deputy sheriff did not hear any conversation either before or after the statement to indicate the context in which it was made. The court then took testimony from juror Webster, who supposedly made the prejudicial statement, Hinrichs, the juror to whom the remark was addressed, and all other members of the jury. Webster denied having made the remark. Hinrichs denied having heard it. The juror sitting directly in front of Hinrichs did not hear it, nor did any other juror or officer in the vicinity. The court inquired if the jurors were still able to be fair and impartial in their deliberations. Hinrichs and Webster both reassured the court of their ability to be fair and impartial jurors and to judge the case solely on the evidence presented. Based on this testimony, the trial court denied defendant's motion for mistrial.

Appellant has failed to show that the court abused its discretion in denying the motion. The record does not support the contention that any remark was made that would prejudice the defendant. The trial court's finding is supported by the evidence, and accordingly, we hold that the defendant was not prejudiced by jury misconduct and was not entitled to a mistrial.

## II.–III.

## LEGISLATIVE ABOLITION OF THE INSANITY DEFENSE AND PRETRIAL RULING ON THE AVAILABILITY OF THE INSANITY DEFENSE

In 1982 the Idaho legislature abolished the insanity defense in criminal cases, by repealing I.C. § 18–209 and enacting I.C. § 18–207(a), which provides that "[m]ental condition shall not be a defense to any charge of criminal conduct."

In this case, prior to trial, defense counsel filed a "Request for Declaration that the Enactment of § 18–207, I.C., the Repeal of §§ 18–208, 18–209, I.C. and the Repeal of Rule 12(g), I.C.R. are Unconstitutional." It was urged that the abolition of the defense deprives criminal defendants of due process rights under the state and federal constitutions.

Both parties extensively argued the issue of justiciability; that is, whether there was any factual showing on the record that would grant the court the authority to render a ruling in the nature of a declaratory judgment on the issue. Rhoades had been examined by a psychiatrist pursuant to his counsel's request. However, the defense did not introduce evidence indicating the psychiatrist's conclusions as to whether Rhoades might be suffering from any mental defect.

The defense contended that no showing was required under the unique circumstances of a capital case. The defense asserted that the court did have jurisdiction to render a declaratory judgment, in that the nature of a declaratory judgment is to clarify legal uncertainty, and having no legal definition of insanity made it impossible for a psychiatrist to render an opinion on whether Rhoades was legally insane.

The defense further argued that even if some showing was required, the prosecution and the court had waived the necessity of presenting preliminary evidence on Rhoades's mental condition when a defense request for psychiatric assistance at state expense was granted without the preliminary showing required. The defense argues that this constituted a waiver of any showing that might be required in the later request for a ruling on the existence of the insanity defense.

Finally, the defense urged that there was a sufficient factual showing on the record to bring Rhoades's sanity into issue. Noting that where the insanity defense is permitted it may be established by lay testimo-

ny, the defense cited the preliminary hearing testimony of one of the arresting officers to the effect that on the night Rhoades was arrested he was unstable and incoherent.

The trial court held a hearing on the defense request for a "declaration" that the Idaho statutes were unconstitutional. During that hearing, the court inquired of counsel as to its assertion of any mental defect defense.

THE COURT: Gentlemen, I've had the opportunity to read defendant's brief and also plaintiff's brief. I've also had the opportunity to review in detail Judge Boyle's memorandum decision he entered in a companion case in Idaho Falls, where the same issue was raised. I've looked at the Montana cases and also those cases you argue. It's my understanding, Mr. Parmenter, that your client does not at this time tender a defense of insanity?

DEFENSE ATTORNEY: Well, that's correct, Your Honor. And that's primarily because of the status of the law. What we're saying is that if we had that law to elect from, we might elect. But as of this point in time, that's correct.

THE COURT: Okay. If that is the correct situation, . . . there is no insanity defense tendered. Then I must look at it as a matter that presents an issue that is not before the court because the defense has never been claimed. We're actually asked to get into the area of dicta, or perhaps speculation in this matter. There's nothing before the court to indicate an insanity defense has been raised, or the court should act upon it.

The court denied the defendant's request for a "declaration."

We perceive the difficulty of the defense in obtaining an expert opinion on such a complex issue without the guiding framework of a legal standard. We also recognize that a psychiatric opinion on the mental condition of a defendant in a criminal case is forged by a long process of interaction between the expert and the defense, and that the result of that process will not generally be available during the pretrial stage of a criminal case.

However, the trial court did not require that the defense present an expert opinion as to the ultimate issue of Rhoades's sanity. The court requested any expression of opinion by the expert as to whether insanity might be an issue in the case, or an assertion by counsel that he was raising the defense of insanity. The court did not require polished testimony concerning exact mental processes or precise cognitive abilities of the defendant. It would have sufficed for the expert to provide a summary affidavit stating that in his opinion, there was a viable issue of insanity involved in the case. Alternatively, the expert might have submitted an affidavit to the effect that it would be impossible for him to render an opinion without a guiding legal standard. Yet another option might be to offer an opinion based on the definition of insanity that Idaho had in place prior to the legislative repeal of the defense, restricting the affidavit to an *in camera* review in order to protect the defense from the consequences of prematurely offering an opinion from an improperly prepared defense expert.

The trial court found that the record did not create a justiciable controversy to support a ruling on the issue of the repeal of the insanity defense. We agree.

The authority to render a declaratory judgment is bestowed by statute. The Declaratory Judgment Act, contained in Idaho Code tit. 10, ch. 12, confers jurisdiction upon the courts the option to "declare rights, status, and other legal relations, whether or not further relief is or could be claimed." I.C. § 10–1201. An important limitation upon this jurisdiction is that, "a declaratory judgment can only be rendered in a case where an actual or justiciable controversy exists." *Harris v. Cassia County*, 106 Idaho 513, 516, 681 P.2d 988, 991 (1984). This concept precludes courts from deciding cases which are purely hypothetical or advisory.

Declaratory judgments by their very nature ride a fine line between purely hypothetical or academic questions and actually

justiciable cases. Many courts have noted that the test of justiciability is not susceptible of any mechanistic formulation, but must be grappled with according to the specific facts of each case. *Harris v. Cassia County*, 106 Idaho 513, 681 P.2d 988 (1984); 22 Am.Jur.2d Declaratory Judgments § 33, at 697. This Court, in *Harris,* adopted the following language from the United States Supreme Court's definition of justiciability as a guiding standard in the context of declaratory judgment actions:

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted).

The same principle as pronounced by this Court provides:

> The Declaratory Judgment Act ... contemplates some specific adversary question or contention based on an existing state of facts, out of which the alleged "rights, status and other legal relations" arise, upon which the court may predicate a judgment "either affirmative or negative in form and effect."

\*   \*   \*   \*   \*   \*

> The questioned "right" or "status" may invoke either remedial or preventative relief; it may relate to a right that has either been breached or is only yet in dispute or a status undisturbed but threatened or endangered; but, in either or any event, it must involve actual and existing facts.

*State v. State Board of Education*, 56 Idaho 210, 217, 52 P.2d 141, 144 (1935).

In the present case, there are no actual and existing facts on the record. The record before the trial court, and before this Court, contains nothing more than the statement of counsel that he desired to inquire into the viability of the defense, and that although Rhoades had been examined by a psychiatrist, no opinion in any form as to Rhoades's mental state could be forthcoming unless the court provided an operative legal definition of insanity.

The testimony of Officer Rodriguez concerning Rhoades's manner on the night of his arrest likewise does not suffice to create a justiciable controversy on the issue of insanity. The officer stated during the preliminary hearing that on the night of the arrest:

> Paul Rhoades was either acting as if he was high on some kind of narcotic, or he was high on some kind of narcotics ... he really didn't have much stability ... he had to be helped to walk. He swayed back and forth when he sat down, almost in a drunken stupor. Didn't say too much, and when he did, he mumbled, as if, I would take it, he was not in control of his senses....

Other testimony confirms Officer Rodriguez's impressions of Rhoades's conduct on the night of the arrest, but there is no evidence in the record as to abnormal conduct at any other time. This testimony establishes that Rhoades was having physical difficulty on the night of his arrest, which was assumed by the officers to be the result of drugs or intoxication. The trial court appropriately concluded that such evidence alone does not rise to the level of a showing of the mental condition of the defendant.

The defense argues that any showing that might be required was waived by

the prosecution on the defense request for appointment of a psychiatric expert at state expense. The United States Supreme Court, in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held that the defendant is constitutionally entitled to psychiatric assistance at state expense once a preliminary showing has been made that the mental condition of the defendant is likely to be an issue in the case. Defense counsel urges that the acquiescence by the prosecution and the court in the motion for a court appointed expert without requiring any preliminary showing on the defendant's mental condition, amounts to a waiver of the required showing on the issue. We disagree.

■ Justiciability is a question of the jurisdiction of the court over the matter at issue. *Baird v. State*, 574 P.2d 713, 716 (Utah 1978); *Mountain West Farm Bur. Mut. Ins. v. Hallmark Ins.*, 561 P.2d 706 (Wyo.1977). It is axiomatic that a lack of jurisdiction may not be cured by means of stipulation or waiver by the parties. *Bowlden v. Bowlden*, 118 Idaho 84, 794 P.2d 1140 (1990); *White v. Marty*, 97 Idaho 85, 540 P.2d 270 (1975), *overruled on other grounds by Carr v. Magistrate Court of the First Judicial Dist.*, 108 Idaho 546, 700 P.2d 949 (1985). Therefore, this defense argument must be rejected.

We uphold the trial court's determination that the record does not create a justiciable controversy to support a ruling on the issue of the repeal of the insanity defense. Having done so, we do not reach the constitutional issue of the legislative repeal of the insanity defense.

## IV.

### WITHHOLDING OF EXCULPATORY EVIDENCE BY PROSECUTION

■ On May 15, 1987, the defense filed a request for discovery, asking for "[a]ll Bingham County and/or Blackfoot City Police reports or investigative materials relative to the Stacy Baldwin homicide which is alleged to have occurred in Bingham County." On July 2, 1987, the prosecution filed a Supplemental Response to Defendant's Discovery Request, listing the items that it had provided pursuant to the discovery request, including, "[a]ll Bingham County and/or Blackfoot City Police reports" relative to the Baldwin case.

Part of the materials submitted to the defense in this exchange was a supplementary police report by Detective Newbold of the Blackfoot Police Department, which detailed the confession of Kevin Buckholz to the killing of Stacy Baldwin. Buckholz had been arrested by Blackfoot Police Officer Love on March 14, 1987, for drunk and disorderly conduct. Love's brief report indicated that Buckholz stated he had "killed the girl at the mini barn." Later, while he was in the holding tank, Buckholz initiated conversation with Officer Larry Christian. Christian filled out the following report of the conversation:

[A] prisoner in the holding tank started talking to me (Kevin Buckholt) [sic] said he "had problems and needed to be put away cause he couldn't function in the regular world," he then proceeded to tell me he shot a girl twice in the back. I said what girl and he said "You know the one from the mini barn." I then asked how many shots did you fire, he said "I don't know I shot several times, I hit her in the back twice." ... I then asked him what kind of gun he used and he said "a '38' then said no a '9' mm I think...."

Christian reported the incident to Detective Newbold, who summarized the statement in his report. That report was provided to defense counsel for Rhoades pursuant to the discovery request for Blackfoot Police reports.

Newbold's report mentions Christian's written report, and outlines that report in detail. However, neither Christian's nor Love's report was provided to the defense. On appeal, Rhoades argues that the prosecution's compliance with the discovery request was inadequate, and in violation of the prosecutor's duty to turn over all exculpatory evidence to the defense.

■ The test by which to measure the prosecutor's duty to disclose evidence is the materiality of the information at issue.

The determination of "materiality" is guided by whether the information tends to create a reasonable doubt about guilt, *State v. Brown,* 98 Idaho 209, 560 P.2d 880 (1977), or is otherwise "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

We don't believe that the outcome of the trial would have been different had the defense received the two other police reports. Officer Newbold's report provided enough detail to stimulate additional inquiry if the defense had been inclined to do so. The defense had the information that there was a confession to the Baldwin murder, the identity of the confessor, the details of the confession, and the name of the officer who heard the confession. With that information they could have contacted Officer Christian and Kevin Buckholz to determine whether the confession was worth pursuing. The defense claims that had they received the two additional reports from the prosecution then they would have made more of an effort to locate Buckholz. We believe that the defense could have made that determination without the other two police reports.

## V.

### JAILHOUSE INFORMANT TESTIMONY

David Holm testified at trial concerning conversations he had with the defendant while they were in the same cell. At that time, he stated that he had not been offered anything in exchange for his testimony. Later, at a post conviction hearing, Holm testified that he was dissatisfied with the sentence he received in his case, and that had he known the sentence he was going to receive, he would not have testified at the Rhoades trial.

Appellant asserts that this change is grounds for a new trial. We disagree.

At the post conviction hearing, when questioned about what he thought he would receive in exchange for his testimony, Holm said:

He [the prosecuting attorney] couldn't ever make any promises. Nobody ever did actually make it a promise.... They couldn't guarantee what the judges would do anyway.... I never did expect anything out of it. I hoped. Of course, I think anybody in my position in a situation that they're put under would hope that they would at least get some favorable consideration. But as far as a definite promise or a definite belief, no. I was just—all the time. I did hope. My attorney hoped. And that's about where we're at.

We fail to see why misplaced hopes on the part of a witness would be reason to grant a new trial. There is no evidence in the record that any type of reward was promised in exchange for the testimony. In addition, Holm's testimony at trial would not have differed. At the post conviction proceeding, Holm stated:

I don't believe there would be any change in my testimony. As far as the case itself. I think the only change there would be as far as—I think would be maybe under the influence. The influences. That actually got me the courage, I guess. I was—you know, I just— I felt assured, You know, that what I was doing was the right thing. And I was assured that it may be in a sense that what I was doing was in essence paying back a debt to society.

The trial court found that this situation did not raise an issue of material fact. We agree.

Appellant further asserts that the trial court should have excluded David Holm's testimony altogether. He argues that jailhouse informants are inherently unreliable, and that Holm, in particular, had a reputation for untruthfulness.

We hold that it was not error for the trial court to admit the testimony of David Holm. It is up to the trier of fact to determine the credibility of witnesses:

An appellate court may not substitute its judgment for that of the jury regarding the credibility of witnesses, the weight of their testimony, or the reasonable infer-

ences to be drawn from the evidence. *State v. Campbell,* 104 Idaho 705, 718–19, 662 P.2d 1149, 1162–63 (Ct.App.1983). *State v. Clay,* 112 Idaho 261, 263, 731 P.2d 804, 806 (Ct.App.1987), *review denied.*

Allowing Holm to testify is not grounds for a new trial. It was the jury's responsibility to weigh the credibility of his testimony.

### VI.

### SUPPRESSION OF INCULPATORY STATEMENTS

Rhoades was arrested March 25, 1987. He was being sought as a suspect in an Idaho murder investigation, when his car was identified in Nevada. A Nevada Highway Patrol Officer, George McIntosh, drove to the scene with two officers from Idaho, Victor Rodriguez and Dennis Shaw. Two Nevada officers, Trooper Neville and Officer Miller, were holding Rhoades at the scene. Another Nevada officer, Shires, arrived at the scene as back up. Shaw testified that as he and Rodriguez approached Rhoades where he was being held against the car by Neville and Miller, Rhoades made a spontaneous statement of, "I did it," without being directly addressed or questioned by any officer. Miller claims to have heard that first statement, although it was not included in his initial report of the arrest. Miller did include that fact in a supplemental report filed two months later. Officer McIntosh testified that he did not hear the statement, nor was it overheard by Trooper Neville.

After being read his rights, Rhoades was transported to the Highway Patrol Substation in Wells, Nevada. He did not make any statements *en route.* Officers Shires, Miller, Neville, McIntosh, Shaw, and Rodriguez were present at the station. Shaw made a statement to the defendant to the effect that if he'd been apprehended earlier, the victims of his crimes might still be alive. Rodriguez testified that in response to that statement, Rhoades stated, "I did it." This second statement at the station was not part of Miller's initial report, although he claims to have overheard it.

Both Shires and Miller reported the statement in supplemental reports filed several months after the arrest. The statement was also not recorded by Officer Shaw in his report. Rhoades made no further statements.

Rhoades argues on this appeal that the trial court should have excluded those statements for three reasons: (1) the questionable reliability of the evidence, given the fact that several officers who claimed to overhear the statements failed to record them in their reports until months after the arrest; (2) the failure of the police to tape record the statements; and (3) the statements were the result of the violation of Rhoades's Miranda rights.

■■■■ On the first point, the defense argues that due process under the state and federal constitutions requires an enhanced degree of reliability during the guilt determination stage of a capital prosecution. We reject this argument.

The United States Supreme Court has imposed many procedural protections for capital cases. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, these cases do not go so far as to alter the types of evidence or establish a minimum degree of reliability of evidence that is admissible during the fact finding phase of a potential capital case. The prosecution is not required to prove the crime by any higher standard than the "beyond a reasonable doubt" standard used in other criminal cases. Admission of evidence is not governed by any separate rules applicable only to capital cases. Therefore, there is no reason to conclude that testimony which is questionable must be excluded during the guilt determination phase of a capital case. The credibility of evidence in a first degree murder case, as in all others, is an issue for the trier of fact.

■■■■ Likewise, we cannot accept the contention that in order to be admissible, statements made in custody must be tape recorded by the police. The defense cites an Alaska case, *Stephan v. State,* 711 P.2d 1156 (Alaska 1985), holding that custodial

confessions must be tape recorded in order to be admissible under the due process clause of the Alaska State Constitution. That case represents no more than the prerogative of each state to extend the protections of its own constitution beyond the parameters of federal constitutional guarantees. We decline to adopt Alaska's standard in Idaho.

We now turn to the issue of whether Rhoades's Miranda rights were violated by the police during his arrest and custody.

■■■ There is some conflict in the record as to whether Rhoades was read his Miranda rights while in the custody of Nevada Officers Miller and Neville, or if he was given the Miranda warnings for the first time by Officer Rodriguez after Rodriguez, Shaw, and McIntosh arrived at the scene. Although the record does not support the trial court's finding that the first statement by Rhoades was preceded by a Miranda warning, that factual issue does not affect our conclusion that both statements were properly admitted into evidence.

The first "I did it" statement, while Rhoades was handcuffed in the parking lot was apparently spontaneous. So spontaneous in fact, that according to uncontested police accounts, Rhoades made the statement without being questioned or otherwise addressed by any of the officers present. As a spontaneous statement, it was admissible whether it occurred before or after Rhoades was read his Miranda rights.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.... Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Although the statement lacked any context to make it meaningful, the trial court correctly concluded that it was for the jury to decide to what Rhoades referred when he said "I did it" at the scene of the arrest.

■■■ The second statement at the station house, made in response to Shaw's comment, is also admissible. The trial

court found that there was insufficient evidence in the record to support the inference that Rhoades asserted his right to remain silent at any time during the arrest and booking. Officer McIntosh did testify that after Rodriguez finished reading the Miranda rights, Rhoades nodded as if to indicate that he understood. Then McIntosh testified that Rodriguez said something else, which McIntosh could not hear, whereupon Rhoades shook his head. McIntosh took the gesture to mean that Rhoades was asserting his right to remain silent.

Those facts are the sole basis in the record for the contention that Rhoades did assert his right to remain silent. There is no evidence in the record as to what Rhoades was responding to when he shook his head negatively. On the strength of this evidence alone, the trial court declined to infer that the shake of the head indicated a desire to remain silent. That finding is not clearly erroneous, given the absolute lack of evidence to the contrary.

*Miranda* teaches that, "[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time, prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627.

■■■ In this case, based on the record before us, Rhoades did not assert his right to remain silent. If he had, Shaw's comment, properly found by the trial court to be "the functional equivalent of interrogation," would have been improper, and the second statement would not have been admissible. The requirement that interrogation must cease comes into play when the accused indicates in any manner that he or she does not desire to converse with the police, or that the presence of an attorney is desired. After rights are read to and acknowledged by the detainee and until the right to silence or counsel is asserted, the police may initiate questioning.

The record indicates that Rhoades was read his rights before the second statement, and acknowledged that he under-

stood them. Although there is evidence that Rhoades was heavily influenced by narcotics at the time of the arrest, Officer Shaw testified that while searching his person, he engaged Rhoades in conversation to test his alertness and found that he had sufficient capacity to understand what was going on around him.

In sum, Rhoades had been instructed upon and understood his rights at the time of arrest, and there is insufficient evidence to indicate that he asserted his right to remain silent. For the foregoing reasons we conclude that the second statement made in response to Shaw's "interrogation" is not subject to suppression under *Miranda v. Arizona.*

## VII.

## ACCELERATED POST CONVICTION PROCEEDINGS

Idaho Code § 19–2719 requires that in capital cases, post conviction relief must be requested within 42 days after the judgment is filed, and completed within 90 days after that. Appellant urges this Court to reconsider our decision in *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988), which held that I.C. § 19–2719 did not violate the defendant's constitutional rights under equal protection analysis. We decline to do so.

Defendant also claims that I.C. § 19–2719 violates his due process rights, which *Beam* did not address. Procedural due process issues are raised whenever a person risks being deprived of life, liberty, or property interests because of governmental action. The requirement is that there must be some process to ensure that the individual is not arbitrarily deprived of his rights in violation of the state or federal constitutions. This requirement is met when the defendant is provided with notice and an opportunity to be heard. *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The United States Supreme Court provides us with a balancing test to determine if proce-

dural safeguards are adequate in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The three factors to be weighed are: (1) the private interests at stake; (2) the government's interest; and (3) the risk that the procedures used will lead to erroneous results. U.S.C.A. Const. Amends. 5, 14. This Court has employed this due process test in *State v. Ankney,* 109 Idaho 1, 704 P.2d 333 (1985).

First, obviously, the defendant's interest is in being afforded an adequate opportunity to present legal and factual issues in his defense. Second, the government's interest in enacting I.C. § 19–2719, stated by the legislature, is "to accomplish the purpose of eliminating unnecessary delay in carrying out a valid death sentence." This was determined by this Court to be a legitimate goal in *State v. Beam,* 115 Idaho 208, 766 P.2d 678 (1988). The focus, then, of our present inquiry, is the third prong of the *Mathews v. Eldridge* test, we must determine whether or not I.C. § 19–2719 provides an adequate process to prevent erroneous results and to ensure that death sentences are not carried out so as to arbitrarily deprive a defendant of his life.

The statute requires the defendant to file a petition for post-conviction relief within 42 days of the filing of the judgment imposing the sentence of death. These challenges arise out of the judicial proceeding just concluded. At this point, counsel has been closely involved with the case for some time, has been present at trial, and has had notice of all issues that are appropriate to be raised within this 42 day limit. All that counsel is required to do is to organize all challenges and issues that arose during trial and are appropriate for appeal within 42 days. That is not an unduly burdensome task. The statute provides adequate notice to the defendant of exactly what is required of him, and sufficient opportunity for all challenges to be heard. In addition, it serves the purpose of the legislature by preventing the unnecessary delays that occur with so much frequency in capital cases.

In *Stuart v. State,* 118 Idaho 932, 801 P.2d 1283 (1990), this court remanded a

second and subsequent petition for post-conviction relief to the district court for an evidentiary hearing. *Stuart* had only learned of the facts raised in the second petition after the first petition had been filed. We held that pursuant to I.C. § 19–4908, the second petition was not barred.[1] It was necessary for the trial court to hold an evidentiary hearing to determine if Stuart's constitutional rights were violated.

In *Stuart*, we cited *Palmer v. Dermitt*, 102 Idaho 591, 635 P.2d 955 (1981) for the sole proposition that, under the appropriate circumstances, I.C. § 19–4908 did not bar successive petitions for post-conviction relief. At this point, it is important to understand some very important facts.

*Palmer* was decided pursuant to the waiver provisions of I.C. § 19–4908. Subsequent to *Palmer*, the legislature enacted I.C. § 19–2719 in 1984. This modified post-conviction proceedings in death penalty cases. Idaho Code § 19–2719(3) requires a defendant to "file any legal or factual challenge as to the sentence or conviction that is known or reasonably should be known." Idaho Code § 19–2719 limits post-conviction relief to one petition unless it is demonstrated to the satisfaction of the trial judge that this issues being subsequently raised were not "known or reasonably should be known." Ineffective assistance of counsel is one of those claims that should be reasonably known immediately upon the completion of the trial and can be raised in a post-conviction proceeding.[2]

A careful reading of *Palmer* reveals that the defendant raised an ineffective assistance of counsel claim in a habeas corpus petition [treated as a petition for post-conviction relief] subsequent to his direct appeal and first post-conviction proceeding. After the direct appeal and first petition failed to produce favorable results, the defendant obtained new appellate counsel and brought a subsequent petition. This Court held that *because the defendant had filed* *a pro se petition immediately after trial raising the ineffective assistance claim, but which claim was omitted through no fault of his own,* the defendant had not waived his claims and the subsequent petition was not barred.

Therefore we hold that I.C. § 19–2719 provides a defendant one opportunity to raise all challenges to the conviction and sentence in a petition for post-conviction relief except in those unusual cases where it can be demonstrated that the issues raised were not known and reasonably could not have been known within the time frame allowed by the statute. The legislature has seen fit to appropriately limit the time frame within which to bring challenges which are known or which reasonably should be known. The process encompassed in I.C. § 19–2719 providing for review by the trial court and then this Court, provides adequate opportunity to present the issues raised and to have them adequately reviewed. Therefore, I.C. § 19–2719 is not unconstitutional under due process analysis.

## VIII.

## VICTIM IMPACT STATEMENTS

We now turn to the issue of the victim impact statement contained in the presentence report. *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), prohibits the introduction of victim impact statements during the sentencing phase of a capital case as violative of the Eighth Amendment to the United States Constitution. In *Booth*, there were two types of information presented in the victim impact statement. The first type consists of "a description of the emotional trauma suffered by the family and the personal characteristics of the victims." The second type contains the "family members' opinions and characterizations of the

---

1. It must be noted that *Stuart* was not decided pursuant to I.C. § 19–2719. This statute was not cited by either Stuart or the State.

2. *In re Cordero,* 46 Cal.3d 161, 249 Cal.Rptr. 342, 756 P.2d 1370 (1988) (Habeas Corpus); *People v. Bean,* 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996 (1988) (Habeas Corpus); *Bundy v. Deland,* 763 P.2d 803 (Utah 1988); *Daniels v. State,* 100 Nev. 579, 688 P.2d 315 (1984); *Sims v. State,* 295 N.W.2d 420 (Iowa 1980); *Commonwealth v. Russell,* 477 Pa. 147, 383 A.2d 866 (1978).

crimes." Both types of information are excluded because, "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth,* 482 U.S. at 503, 508, 107 S.Ct. at 2533, 2535. Both types of information are present here.

In the present case, the portion of the presentence investigation report containing the victim impact statements is as follows:

The victim, Stacy Dawn Baldwin, who was age 21 at the time of her death, was employed as a night clerk at the Mini–Barn Convenience Store in Blackfoot, Idaho. It was while she was discharging her duties in that capacity, that she was robbed, kidnapped and shot to death on 2/28/87. Mrs. Baldwin was married and resided with her husband Myron Baldwin, in Blackfoot, Idaho. She and her husband were active members of the LDS Church. She was athletic and maintained her physical fitness by exercise and swimming. He [sic] husband Myron, indicated that he and Stacy had met in high school in 1981. They had planned to marry after he completed a Mission for the LDS Church. He stated that he was sent on his mission to Canada in 1984, where he spent two years. He returned in April of 1986, and he and Stacy were married on 8/1/86. He indicated that he still suffers emotional stress caused by the senseless murder of his wife. He stated that he wants the maximum sentence given to the man who killed Stacy. He added that he believes in the death sentence. Mr. Baldwin further indicated "I don't want him to ever have the chance to do this to anyone else." Mr. Baldwin indicated that on the night she was abducted and killed, he should have stayed with her at the Mini–Barn as he usually did on Friday nights, but he had been ill with influenza and she told him she would be OK and for him to stay home.

Evelyn Baldwin, Myron's mother indicated that for several months after Stacy was killed, Myron "Shut the world out," but time has tempered his pain somewhat and he is again socializing with family and friends. She stated that the Baldwin family is satisfied with the outcome of the trial. She related that they favor a death sentence in this case.

The victim's mother, Verna Taylor, recalled in an emotional interview that her daughter's murder was the "biggest shock of her life." She indicated that the victim had seven siblings all of who still grieve at the loss of their sister. She explained that "Stacy did everything right in her life and didn't deserve to die like that." She indicated that she has to deal with her feeling about Stacy's death everyday. Mrs. Taylor stated "I hope he burns in hell for what he did to Stacy. I'm glad she fought him." She added "I approve of capital punishment."

This is undoubtedly a victim impact statement of the kind contemplated in *Booth,* and as such, it was error for the trial court to admit it.

The next level of inquiry is to determine if the victim impact statement constitutes harmless error under the *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990), exception. In *Paz,* the Court wrote:

This decision should not be interpreted in any fashion to condone or permit victim impact statements in capital cases. Victim impact statements are clearly proscribed by *Booth v. Maryland* and *State v. Charboneau.* It is a rare capital case where the inclusion of a victim impact statement will not fatally flaw the entire sentencing procedure.

*Paz,* 118 Idaho at 558, 798 P.2d at 17.

The test to apply to determine if the use of such statements was harmless is whether this Court is assured that "it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Here, three members of the victim's family commented. All three explicitly said that they favored the death penalty in this case. The victim's husband stated that "he wants the maximum sentence given to the man who killed Stacy," and "that he believes in the death sentence." The victim's mother-in-law said that the Baldwin family favors a death sentence in this case. The victim's

mother stated, "I hope he burns in hell for what he did to Stacy. I'm glad she fought him.... I approve of capital punishment."

We cannot determine from the record if the trial judge considered or relied on these statements in imposing the death sentence. Since the trial court allowed the victim impact statements to be filed for consideration, we must assume that he did consider them.

In that the victim impact statements presented to the court were considered is error under the rule of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), we must consider if this error requires reversal.

This Court, in *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990), relying on *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), held that victim impact statements included in the presentence report while error could, under appropriate circumstances, be harmless error.

The trial court in this case carefully weighed the evidence, including aggravating and mitigating factors. There is no indication that the victim impact statements diverted the trial court from its primary function of considering the person being sentenced and not the victim or the victim's family.

Obviously, the trial court does not make decisions in a vacuum. By the time a judge is called upon to decide on a sentence, the judge has heard the testimony and evidence put on at trial, has seen the impact of the crimes on the victim's family and community, and has been closely involved with the details of the case, sometimes for years. It is evident from the findings of the trial court that the nature of this crime was such that the victim impact statements, if they were considered at all, were not a decisive factor in the decision to impose the death penalty. The facts recited by the court in passing sentence are facts that would have been known to the trial judge without the victim impact statements.

In reviewing the record in this case, we are convinced beyond a reasonable doubt that the victim impact statements in the presentence investigation report, describing the family of the victim and their recommendation of sentence, did not influence the trial court in its imposition of sentence. The error was therefore harmless, and the case need not be remanded for sentencing.

IX.

## WHETHER THE DEATH PENALTY WAS PROPERLY IMPOSED

Appellant asserts that the trial court failed to adequately consider alternatives to the death penalty. In *State v. Leavitt*, 116 Idaho 285, 775 P.2d 599 (1989), this Court reversed the imposition of the death penalty and remanded, because:

[T]he trial court failed to give adequate consideration of the alternatives which exist between the distant poles of 'rehabilitation and possible probation,' or the death penalty. Clearly, alternatives were and are available to a sentencing court, such as a fixed life sentence.

*Leavitt*, 116 Idaho at 294, 775 P.2d at 608.

The Court in *Leavitt* did not specify what constitutes "adequate consideration of the alternatives," or exactly what the trial court would have to say to show that the alternatives were adequately considered. Here, in the Findings of the Court in Considering Death Penalty the trial court did not discuss alternatives to the death penalty. However, after those findings were issued, the parties were allowed to file briefs in response to an evidentiary hearing and the defendant raised the issue of alternatives to the death penalty as required by *Leavitt*. The trial court then addressed this in the Supplement to Memorandum Decision and Order. He stated:

The court carefully considered the objectives of sentencing and expressly finds that any rehabilitation that is possible is heavily outweighed by the need to protect society, deter the crime of murder and to punish and obtain retribution for the wrong committed. The court considered penalties less than death, and

determines that in this case the imposition of the death penalty would not be unjust but that the imposition of any other sentence would seriously depreciate the seriousness of the crime committed. If any situation ever warranted the death penalty, it is clearly manifest in this case.

We hold that this is sufficient to indicate that the trial court did consider alternatives to the death penalty and decided against imposing them after contemplating the unique circumstances of this case.

■ Defendant next argues that he is entitled to a new presentence report and a new sentencing hearing in order to have the opportunity to present new mitigating circumstances, such as witnesses attesting to his cooperation as a prisoner. We find no support for this argument.

■ In his Petition for Post Conviction Relief, defendant argued that the trial court did not weigh the mitigating circumstances against each aggravating circumstance as required by *State v. Leavitt,* 116 Idaho 285, 775 P.2d 599 (1989), and *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). *Charboneau* set out the requirement:

> [T]hat all the mitigating circumstances presented must be weighed against each of the aggravating circumstances separately. We hold that the trial court may sentence the defendant to death, only if the trial court finds that all the mitigating circumstances do not outweigh the gravity of each of the aggravating circumstances found and make imposition of death unjust.

*Charboneau,* 116 Idaho at 153, 774 P.2d at 323.

Here, the trial court set forth four and a half pages of mitigating circumstances in his Findings of the Court in Considering the Death Penalty. He was well aware of the requirement in *Leavitt* and *Charboneau* and stated:

> In the weighing process, the court carefully avoids "duplicating" or "stacking" the statutory aggravating factors and weighs each and every mitigating factor

found, both singularly and collectively, against each of the statutory aggravating factors.

This statement, plus the extensive sections detailing the mitigating factors and aggravating circumstances, is sufficient to show that the trial court completed the weighing process satisfactorily. It would be tedious and repetitive for the court to state each mitigating factor over and over for the five aggravating circumstances found. It is enough to, as in this case, have one section setting forth all mitigating factors and one section setting forth all aggravating circumstances.

As for the defendant's claim that the trial court engaged in impermissible speculation and overemphasized aggravating factors, appellant cites no specific examples in his brief, but says only that "certain comments indicate a predisposed negative attitude towards the defendant." We find no merit in this argument.

■ The final issue presented by the defendant concerning the imposition of the death penalty is that he was improperly sentenced by a judge without jury input. This Court has held "that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states." *State v. Creech,* 105 Idaho 362, 373, 670 P.2d 463, 474 (1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). In addition, the United States Supreme Court held in *Clemons v. Mississippi,* 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725 (1990), that "[a]ny argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." In *Walton v. Arizona,* — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court held that Arizona's statute which, like Idaho's, provides for sentencing by a judge in capital cases is not unconstitutional.

## X.

### COMPELLING DEFENSE EXPERT TO PREPARE A WRITTEN REPORT OR TO BE INTERVIEWED BEFORE TESTIFYING

■ The defendant hired a ballistics and hair expert to examine the State's evidence. The expert did not prepare or provide any written reports to the defense. The prosecutor sought an order from the court requiring the defense to "provide the State with copies of reports of examinations conducted by the defense experts ... whom the defendant intends to call at trial," or in the alternative to allow the prosecutor to "interview the defense experts; if reports are not, or have not yet been prepared...." The defense objected to this procedure. The trial court ruled that the expert must either provide a written report to the prosecutor or allow the prosecutor to interview him pursuant to Rule 16(c)(2) of the Idaho Criminal Rules, which provides:

> Upon written request of the prosecuting attorney, the defendant shall permit the State to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce in evidence at the trial, or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to testimony of the witness.

Idaho Criminal Rule 16(c)(2) clearly allows access to reports that the defendant intends to introduce at trial or that were prepared by a witness whom the defendant intends to call at trial. However, in ordering a defense expert to prepare a report for opposing counsel, or to submit to an interview by opposing counsel, the court overstepped the boundaries of the rule. The Washington Supreme Court interpreted an analogous criminal discovery rule, in *State v. Hutchinson*, 111 Wash.2d 872, 766 P.2d 447 (1989), which involved a similar situation. They held that:

It is undisputed that the defendant may be required to disclose any existing expert's report he intends to use at trial. However, the rule does not say that an expert can be required to make a report at the request of the opposing party. Defense counsel claims that no written reports have been requested, received or written. The clear language of the rule does not authorize the trial court to require the defendant's experts to prepare written reports for the State when they have not been prepared for the defendant.

*Hutchinson*, 111 Wash.2d at 877, 766 P.2d at 450.

However, we do not believe that this error resulted in prejudice to the defendant. This case differs from *Hutchinson*, because here, the defense did anticipate having the expert prepare a report, but told the prosecutor that it would not be available until a week before trial. The prosecutor was concerned that this would not be enough time in which to use the evidence to prepare for trial. In managing the trial procedure, the court set a deadline for the production of the expert report, which was within his authority.

## XI.

### DENIAL OF MOTION FOR CONTINUANCE

■ The defendant planned to call an expert witness, Mr. Fox, to counter the State's ballistic evidence. He was unable to attend due to prior commitments. The defense filed a motion for a continuance, which the trial court denied. The defense then made alternative arrangements with another expert, Ned Stuart, whose findings covered the same area as Fox's conclusions. During the course of the trial, one of Mr. Fox's commitments was taken care of, and he was available to testify. Defendant contends that had he called Fox, the State would then have called Stuart.

Rhoades asserts that it was an abuse of discretion for the trial court to deny the motion for continuance because it resulted

in prejudice to the defendant. We disagree.

A decision to grant or deny a motion for continuance is vested in the sound discretion of the trial court. *State v. Richardson*, 95 Idaho 446, 511 P.2d 263 (1973), *cert. denied*, 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974). Here, the defendant has not shown that the trial court abused its discretion by denying the continuance. The purpose of the expert witness's testimony was to counter the State's ballistics evidence. This was done. We do not find prejudice to the defendant resulting in an unfair trial as a result of the testimony being given by one expert witness as opposed to another.

## XII.

## PROPORTIONALITY

■ Idaho Code § 19–2827(c)(3) requires this Court to determine in each capital case, "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Our perusal of the legislative history regarding the proportionality of sentences does not offer much guidance. The Statement of Purpose and the committee minutes for the bill that was eventually passed and codified as I.C. § 19–2827 expressed only a concern that the Idaho statute be updated to reflect recent ruling by the United States Supreme Court:

## STATEMENT OF PURPOSE

Only a few years ago, the United States Supreme Court made new "rules" concerning imposition of the death penalty for serious crimes. So that we conformed with this U.S. Supreme Court interpretation of the federal Constitution, the Idaho Legislature enacted in 1973 our present death penalty Sections 18–4003 and 18–4004, *Idaho Code*. Then, last year, the United States Supreme Court again changed the rules relating to capital punishment—after many states, like Idaho, had acted in response to its previous decision. The Court, in five cases, set forth new, more definitive rules concerning sentencing where the death penalty was sought to be imposed. The purpose of this bill is to codify into Idaho law these present requirements imposed on the states by these most recent United States Supreme Court decisions on capital punishment so that we will conform with this latest expression of the law.

There is no mention of proportionality, or any expression by the legislature that we are required to review the proportionality of sentences with a special standard or test. The requirement that the death sentence not be disproportionate to "the penalty imposed in similar cases," is one of several considerations this Court must examine in each death penalty case. The legislature did not see fit to establish a separate standard for proportionality review of sentences when I.C. § 19–2827 was enacted.

This Court looked at the proportionality of death sentences in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), and reviewed several cases in which the death penalty had been imposed or could have been imposed. The Court compared the facts of the crimes with the facts of the case they were reviewing to determine whether or not the sentence was disproportionate. This is the procedure that has been followed by this Court. We must do likewise.

In this case, Paul Ezra Rhoades kidnapped Stacy Baldwin from the convenience store where she was working, forced her into a pickup truck and drove her to a secluded area where he attempted to attack her. The trial court found that Baldwin fought back, and:

[F]inally as she was on hands and knees trying to get away, he shot at her with his pistol. The first shots missed her and made glancing marks in the snow. Finally his shots hit her. One ricocheting bullet lodged in her elbow and one bullet went through her back and through her lungs. The tread on the soles of his boots left their imprint as he walked towards Stacy, but then he left

while she was still alive. She lived for about one to one and one half hours and then died alone in the cold.

In considering this crime and this defendant, compared to similar crimes and similar defendants,[3] the record in this case and the district court's findings and conclusions in imposing the sentence, we hold that the death sentence is not excessive or disproportionate.

## XIII.

## CONCLUSION

After independently reviewing the record and transcript describing the character of the defendant, the nature of the crime of which he has been convicted, the circumstances of the crime of which he has been convicted, we hold that there existed an adequate basis for imposing the death penalty.

The judgment entered and sentence imposed are affirmed. Upon issuance of the remittitur, the district court shall set a new execution date. I.C. § 19–2719(11).

BAKES, C.J. and WINMILL, J., Pro Tem, concur.

BISTLINE, Justice, concurring in the result and specially concurring as to Part XII.

Concurring generally in most of the Court's opinion, I do question the propriety of citing to companion cases which were facially not at all proportional, referring to *State v. Fetterly* and *State v. Windsor; State v. Beam* and *State v. Scroggins; State v. Bainbridge* and *State v. Sivak.* Also, upon revisiting my dissent in *State v. Major,* it is seen as another case which the majority should refrain from citing. As to the companion cases, Fetterly, Beam, and Sivak are awaiting execution; Windsor, Scroggins, and Bainbridge will not suffer that fate. Further enlightenment is readily available in *Fetterly,* 115 Idaho at 236, 766 P.2d at 706. Even more enlightening are the trial court's remarks at sentencing Karla Windsor to be executed, 110 Idaho at 425–27, 716 P.2d at 1197–99, under the heading of "Findings of Facts and Argument Found in Possible Mitigation," and concluding with the imposition of the death sentence, plus the remainder of the sentencing remarks set out in Appendix B "Sentencing," 110 Idaho at 444, 716 P.2d at 1216. For the views of the sentencing judge following this Supreme Court's opinion which vacated the sentence of death and remanded for resentencing, see Part I of *State v. Fetterly,* 115 Idaho at 232–33, 766 P.2d at 702–03.

In sum, it is submitted that Justice McDevitt's opinion for the Court is a first step in a better direction. *Ad hoc* assess-

**3.** *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991); *State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991); *State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Smith,* 117 Idaho 891, 792 P.2d 916 (1990); *State v. Lankford,* 116 Idaho 860, 781 P.2d 197, *stay granted,* 490 U.S. 1061, 109 S.Ct. 2058, 104 L.Ed.2d 623 (1989); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989); *McKinney v. State,* 115 Idaho 1125, 772 P.2d 1219 (1989); *State v. Fetterly,* 115 Idaho 231, 766 P.2d 701 (1988); *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied,* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986); *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied,* 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985); *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336, *cert. denied,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979).

ments of a capital murderer's right to live in perpetual confinement, or be executed should eschew all prior notions (literally, not figuratively) of proportionality, in which this Court has, by rote citation, allowed itself to indulge. Justice McDevitt, at the close of his opinion, correctly observes that Justice Shepard in authoring the 1983 *Creech* opinion,[4] reviewed several death penalty cases which in time were subsequent to the 1977 legislative amendment of Idaho's death sentencing provisions. Justice Shepard found and cited to *Creech, Lindquist, Needs,* and *Osborn.*[5] The 1979 *Creech* case was distinct from the 1983 *Creech* case, and Justice Shepard detailed the salient facts which led to imposition of death sentences, and concluded that Creech's murder of Dale Jensen was on a par with the murders committed by Osborn, Needs, and Lindquist. The recitation of the cases which he stated as having been reviewed was unnecessary.[6]

It is also high time to comply with our Idaho Constitution and put the awesome decision of life or death back in the hands of twelve tried and true jurors. It was ever thus prior to the adoption of the Idaho Constitution. Just three years ago, Justice Johnson, in *Steed v. Young,* 115 Idaho 247, 252, 766 P.2d 717, 720 (1988), cited to *Christensen v. Hollingsworth,* 6 Idaho 87, 93, 53 P. 211, 212 (1898), for the proposition that, "art. 1, § 7 of our Constitution simply secures the right to jury trial 'as it existed at the date of the adoption of the Constitution.'" Justice Huntley has stated the same, and added that in the context of a capital case the jury at the time of statehood had the power to decide between the penalty of life imprisonment, or death, by the degree of murder declared in the verdict. His views are perpetuated, along with my own, in *State v. Creech,* 105 Idaho at 375–412, 670 P.2d at 476–513.

**JOHNSON, Justice, concurring and concurring specially.**

I concur in all parts of the Court's opinion, except part XII (Proportionality), in which I concur specially.

The legislature has directed us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827(c)(3). The legislature copied this provision from the death sentencing scheme enacted in Georgia following the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Ga.Code Ann. § 17–10–35(c)(3) (1982).

In *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 875–76, 79 L.Ed.2d 29, 35–36 (1984), the Supreme Court differentiated between traditional proportionality and the proportionality to which I.C. § 19–2827(c)(3) refers:

Traditionally, "proportionality" has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. The death penalty is not in all cases a disproportionate penalty in this sense.

The proportionality review sought by Harris, required by the Court of Appeals, and provided for in numerous state statutes is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the

---

**4.** *State v. Creech,* 105 Idaho 362, 374, 670 P.2d 463, 475 (1983).

**5.** *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979); *State v. Needs,* 99 Idaho 883,

591 P.2d 130 (1979); and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

**6.** The lengthy recitation of the cases in Justice Shepard's opinion will be found in footnote 2, 105 Idaho at 375, 670 P.2d at 476.

penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

(Citations and footnotes omitted).

In *Pulley*, the Supreme Court ruled that the statutory proportionality review mandated by statutes such as I.C. § 19–2827(c)(3) is not required by the eighth amendment. *Id.* In *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262, 288 (1987), the Supreme Court reaffirmed that this statutory proportionality review is not constitutionally required "where the statutory procedures adequately channel the sentencer's discretion."

Recently, the United States District Court for the District of Idaho noted that proportionality review is not constitutionally required but that *Pulley* and *McCleskey* "make clear that proportionality review *may* be considered and implemented by the states as an additional safeguard against arbitrarily imposed death sentences." *Beam v. Paskett*, 744 F.Supp. 958, 960 (D.Idaho 1990) (emphasis in original).

Therefore, I conclude that the review required by I.C. § 19–2827(c)(3) is entirely governed by the statutory intent of the legislature and not by any constitutional considerations. This statutory intent is revealed by the other provisions of I.C. § 19–2827 and by decisions of this Court applying the statute.

I.C. § 19–2827(g) provides that the Court "shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975." In *State v. Creech*, 105 Idaho 362, 375 n. 2, 670 P.2d 463, 476 n. 2 (1983), the Court read I.C. § 19–2827(c)(3) and (g) together "as requiring a comparison of the capital cases from 1975 to the present."

I.C. § 19–2827(a) provides that this Court must review a death penalty sentence "on the record." In *State v. Scroggins*, 110 Idaho 380, 387, 716 P.2d 1152, 1159 (1985), the Court construed I.C. § 19–2827(a) and (c)(3) together to require "an independent review of the sentence on the record." In *Scroggins*, the Court concluded that the sentence of death imposed in that case was "excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." 110 Idaho at 387, 716 P.2d at 1159. The Court said:

We have painstakingly considered the record, and in so doing, have focused not only on the crime and the circumstances surrounding its commission but on the age, characteristics, criminal record and personal involvement of *this* defendant. We must conclude that the death sentence should not have been imposed in this case because in light of the following considerations, the death sentence as applied to this defendant was excessive.

*Id.* (emphasis in original).

Among the considerations discussed by the Court in *Scroggins* were that Scroggins did not have a history of violent criminal conduct, that his mental age was only 13.8 years, that he was under tremendous psychological pressure, and that he had failed to develop mature responses to stressful situations. 110 Idaho at 388, 716 P.2d at 1160.

In *State v. Windsor*, 110 Idaho 410, 420–22, 716 P.2d 1182, 1192–94 (1985), the Court said:

Whenever the death penalty is imposed this Court is required to conduct an independent review of the record to insure ... that when both the crime and the defendant are considered, a sentence of death is not excessive or disproportionate. After careful consideration of both the crime and the defendant, we conclude that the sentence of death imposed in this case was excessive and disproportionate. We therefore set aside the death sentence and remand for resentencing.

. . . .

The concept of individualized sentencing is firmly entrenched in modern American jurisprudence. The familiar maxim that punishment should fit the crime has been broadened to provide that punishment should also fit the criminal. With this in mind, we now turn our focus to the defendant as an individual, outlining those factors in Windsor's background

and character which convince us that the death penalty was excessive in this instance. We begin by noting that Windsor, unlike the majority of capital defendants, has no formal criminal record nor significant history of prior criminal activity. There is no history of violent criminal activity, nor is there an indication that Windsor possesses any propensity toward violence.

(Citation omitted).

The Court then reviewed other circumstances of Windsor personally, including her skills and abilities, her education, her experience and training, her troubled childhood and serious problems in her home environment. 110 Idaho at 422–23, 716 P.2d at 1194–95.

The trial court described the crime in this case in the findings of the court in considering the death penalty:

The Defendant Paul Ezra Rhoades ... was observed loitering around convenience stores in Blackfoot and Idaho Falls and watching the female employees. On February 28, 1987, the defendant entered [a convenience store] in Blackfoot, Idaho. He worked nearby as a drywaller and frequented the store, but on this evening, he stayed only a short time and then left.

Near midnight he returned and at gunpoint robbed the till and forced clerk, Stacy Dawn Baldwin, age 21, into his pickup and drove her to a secluded spot near the Snake River just off Rose Road in Bingham County. He attempted to attack her, she fought back, and finally as she was on hands and knees trying to get away, he shot at her with his pistol. The first shots missed her and made glancing marks in the snow. Finally his shots hit her. One ricocheting bullet lodged in her elbow and one bullet went through her back and through her lungs. The tread on the soles of his boots left their imprint as he walked toward Stacy, but then he left while she was still alive. She lived for about 1 to 1½ hours and then died alone in the cold.

The trial court described the defendant in this case in the findings of the court in considering the death penalty:

The defendant, male caucasian, was born January 18, 1957. He is unmarried. Until incarcerated he lived with his parents.... He has a close relationship with his parents, two brothers and two sisters.

He was born and raised in Idaho Falls, Idaho. He liked grade school, but he had other interests in junior and senior high school and he dropped out of school in the 9th grade. He attempted to enlist in the armed forces, but was rejected because of physical problems caused by polio during his early childhood. He went to work ... at 16 years of age, but was involved in an industrial accident and the tips of his fingers were cut off. When his fingers healed, the defendant went to work with his uncle and his father and later his brother in the drywall construction business. The defendant is considered an excellent craftsman.

The defendant describes his interests as fishing and boating and reading "fantasy" novels.

The defendant denies any serious relationships or romantic ties with women, although he has numerous female friends. His mother describes him as responsible and easy going and a nonviolent person that does not hold a grudge and who "never went out looking for trouble." She points out that children liked him and that he was a "father image to children" in the neighborhood and those he babysat.

The defendant suffered with polio at about age 4 and spent considerable time in the [hospital]. The illness necessitated that he have many operations on his feet and suffered considerable pain and as a result, the defendant is not well coordinated.

His aunts and lady friends describe the defendant as being a very compassionate person who was responsible and trustworthy.

One friend ... describes him as "being her big brother" who can listen to her

and in whose presence she feels comfortable.

....

He admits that he has abused alcohol and drugs.

The presentence investigation report indicates that Rhoades had a prior criminal record that included offenses of resisting and obstructing an officer, petit theft, inattentive driving, driving while suspended, infamous crime against nature, rape, kidnapping, first degree murder, use of a firearm in the commission of a felony, second degree murder and robbery.

As directed by I.C. § 19-2827(c)(3) and the decisions of this Court interpreting it, I have reviewed the sentence of death imposed on Rhoades in this case compared to the penalty imposed in similar cases in which the sentence was imposed in 1975 or later, considering both the crime and the defendant, to determine whether Rhoades' sentence is excessive or disproportionate. For ease of reference, I append a summary of the cases I have compared.

The cases I find most similar to this one so far as the crime is concerned are:

1. *State v. Pizzuto* (death penalty imposed)
2. *State v. Searcy* (fixed life imposed)
3. *State v. Lankford* (death penalty imposed)
4. *State v. Smith* (fixed life imposed)
5. *State v. McKinney* (death penalty imposed)

6. *State v. Fetterly* (death penalty imposed)
7. *State v. Bainbridge* (fixed life imposed)
8. *State v. Paradis* (death penalty imposed)
9. *State v. Sivak* (death penalty imposed; vacated on procedural grounds; remanded for resentencing)

The death penalty was imposed by the trial court and upheld by this Court in the majority of these cases. On the basis of this comparison of these case in which the crime was similar to the murder in this case, I find the death sentence imposed on Rhoades in this case not to be excessive or disproportionate.

The cases I find most similar to this one so far as the defendant is concerned are:

1. *State v. Pizutto* (death penalty imposed)
2. *State v. Searcy* (fixed life imposed)
3. *State v. Smith* (fixed life imposed)
4. *State v. Beam* (death penalty imposed)
5. *State v. Aragon* (death penalty imposed)

The death penalty was imposed by the trial court and upheld by this Court in a majority of these cases. On the basis of this comparison of these cases in which the circumstances of the defendant were most similar to the circumstances of Rhoades, I find the death sentence imposed on Rhoades not to be excessive or disproportionate.

APPENDIX TO *RHOADES* (Baldwin) OPINION OF JOHNSON, J.

| CASE NAME & CITATION | CHARACTERISTICS OF DEFENDANT | CIRCUMSTANCES OF MURDER | CONVICTION AND SENTENCE BY TRIAL COURT | DISPOSITION BY IDAHO SUPREME COURT |
|---|---|---|---|---|
| *State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991). | Eighteen-year-old male, suffered to a moderate degree from an anti-social personality disorder, severe alcoholic, troubled childhood. | Defendant and victim were drinking together at a bar after which they traveled to a remote area where victim apparently made sexual advances toward defendant. Victim taunted defendant after he refused her advances which prompted defendant to choke victim until blood came out of her mouth. During the ensuing struggle victim and defendant ended up outside of the automobile after which defendant struck victim with a board and later repeatedly ran over her with the automobile. Defendant then burned the body of the victim with lighter fluid and charcoal. | Fixed life. | Affirmed. |
| *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991). | Previously convicted of criminal sexual conduct and manslaughter in other states. Sociopath exhibiting "explosive features," violent individual, expressed no remorse, history of violent behavior. | Pizzuto robbed and murdered woman and her adult nephew in their cabin with a hammer, one of the victims was also shot, victims were buried in a shallow grave near the scene of the murders. | Convicted of first-degree murder, felony murder, robbery. Death sentence imposed. | Affirmed. |
| *State v. Searcy,* 118 Idaho 632, 798 P.2d 914 (1990). | Troubled childhood, addiction to cocaine, psychiatric evidence indicating lack of mental responsibility. Committed various crimes to support chemical dependency. | Defendant planned robbery of victim's grocery store in order to get money to buy cocaine. Defendant hid in store where he was later confronted by victim, a struggle followed during which defendant shot victim in the stomach. Defendant told victim that if she opened the safe, he would call an ambulance. Victim opened the safe after which defendant placed a rifle to her head and shot and killed her. | Convicted of first-degree murder and robbery, sentenced to determinate life sentence on first-degree murder, indeterminate life sentence on robbery and enhancement of 10 years for use of firearm. | Judgment of conviction affirmed, sentence imposed, remanded to trial court with instruction to impose sentence with defendant present. |
| *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990), *cert. denied* ___ U.S. ___, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991). | Prior manslaughter conviction in Oregon, showed no rehabilitation after previous fines, probation, incarceration and parole, high probability that Paz would remain unpredictable and irrational in overreacting to confrontation and likely to kill fellow inmates if imprisoned. | Shot and killed victim in restaurant after earlier engaging in verbal exchange with victim and two of victim's companions, companions seriously injured in shooting. | First Degree Murder. Death penalty imposed. | Affirmed. |

| Case | | | | Result |
|---|---|---|---|---|
| *State v. Smith,* 117 Idaho 891, 792 P.2d 916 (1990). | Chemical dependency, dominated by his brother (deceased accomplice), various prior criminal activity and outstanding warrants. | Body of victim was discovered in a partially burned stolen Cadillac. Later, .22 and .38 caliber bullets were removed from the victim's body and fingerprints of defendant were found in the Cadillac. | Convicted of first-degree murder, robbery, and third-degree arson. Fixed life sentence on conviction of first-degree murder and consecutive fixed-life sentence on robbery conviction. | Affirmed. |
| *State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989), *cert. denied* ___ U.S. ___, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990). | Aggressive antisocial personality prone to violence. | Defendant and brother robbed and murdered retired marine officer and wife while camping in Idaho County, victims held at gunpoint and killed with multiple blows to the skull from night stick. | Convicted of two first-degree murders, death penalty imposed. | Affirmed. |
| *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989), *cert. denied* 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989) and 493 U.S. 923, 110 S.Ct. 290, 107 L.Ed.2d 270 (1989). | Defendant had previously committed several violent acts towards victim (his ex-wife), purchased rifle used in killing days before shooting. | Defendant repeatedly shot former wife with .22 caliber rifle outside of her home. | First-degree murder. Death penalty imposed. | Conviction affirmed, sentence vacated because of consideration of victim impact statement, and remanded for resentencing. |
| *McKinney v. State,* 115 Idaho 1125, 772 P.2d 1219 (1989), *cert. denied* ___ U.S. ___, 110 S.Ct. 3292, 111 L.Ed.2d 800 (1990). | Defendant claimed he was physically and sexually abused by his father as a child. | Defendant and female companion devised a plan to rob and kill victim, a recent acquaintance, lured victim into the desert and shot execution style. *See McKinney* below. | Along with first-degree murder also convicted of conspiracy to commit murder, robbery and conspiracy to commit robbery. Death penalty imposed. | Affirmed. |

| Case | | | | Result |
|---|---|---|---|---|
| *State v. Fetterly*, 115 Idaho 231, 766 P.2d 701 (1988), *cert. denied* 492 U.S. 925, 109 S.Ct. 3262, 106 L.Ed.2d 607 (1989). | Prior criminal record. | Along with co-defendant Windsor, was convicted of first-degree murder, burglary and grand theft for the robbery and stabbing death of the victim whom they later dumped in the Snake River. | Along with murder, convicted of burglary and grand theft. Death penalty imposed. | Affirmed. |
| *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied* 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986). | No formal criminal record or history of prior criminal activity, defendant cooperative, skills and ability which indicate defendant may ultimately be capable of maintaining employment and functioning as a productive member of society, troubled childhood. | Along with co-defendant Fetterly, was convicted of first-degree murder, burglary and grand theft for the robbery and stabbing death of the victim who they later dumped in the Snake River. Windsor did not commit actual act of stabbing victim. | First-degree murder. Death penalty imposed. | Sentence of death vacated because sentence was excessive and disproportionate. |
| *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986). | No history of violent criminal conduct, inadequate upbringing, age 18 at the time of crime (mental age was 13.8 years), failed to develop mature responses to stressful situations. | Defendant and co-defendant (Beam) were involved in the rape and subsequent murder of a 13-year-old female victim, the victim was drowned and throat was slashed, jury indicated that defendant committed only attempted rape and did not directly commit the crime of murder, defendant reported crime to the police. | Convicted of first-degree murder and attempted rape, sentenced to death. | Sentence vacated, sentence of death was excessive and disproportionate to penalty imposed in similar cases. |
| *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985). | Defendant engaged in abuse of other women and their minor children prior to relationship with present girlfriend and her son, defendant had committed at least three prior rapes along with numerous examples of other violent behavior. | Defendant convicted in the beating death of a three-year-old boy, the son of his live-in girlfriend, evidence of numerous incidences of physical abuse of victim prior to death. | Convicted of murder by torture in first-degree. Death penalty imposed. | Affirmed. |
| *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). | See *Fetterly* above. | | First-degree murder. Death penalty imposed. | Affirmed. |

| Case | Facts | Disposition | Result |
|------|-------|-------------|--------|
| *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986) and 489 U.S. 1073, 109 S.Ct. 1360, 103 L.Ed.2d 827 (1989). | The defendant abused drugs, was on parole for burglary when the murder was committed, had been exposed to and participated in prior sexually deviant behavior, had tortured animals, was impulsive, and lacked any adequate conscience. | The victim, a thirteen-year-old girl, was handcuffed and raped, semen was found in her vagina and rectum, the victim's throat was slashed and the cause of death was listed as drowning. | Convicted of first-degree murder, rape, death penalty imposed. | Affirmed. |
| *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985). | Evidence was admitted indicating defendant's behavior and thinking were suggestive of organic brain disfunction possibly caused or enhanced by a severe head injury from a motorcycle accident, defendant was viewed as being good natured and eager to please, hypersuggestable to the influence of others, reading and writing problem although not retarded, 10th grade education. | Victim, a female cashier who was acquainted with defendant and Sivak, was shot several times and stabbed numerous times while working at gas station, victim was also sexually assaulted, defendant along with co-defendant (Sivak) robbed store. | Defendant was convicted of first-degree murder and robbery, sentenced to two consecutive fixed-life sentences. | Reversed and remanded for new trial because of various errors at trial. |
| *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984). | At the time of the incident the defendant was calm, refused to aid the victim or seek help and began planning a cover-up of his involvement, past criminal record including charges of child abuse and assault with a deadly weapon, lack of remorse over death of victim, no further description provided. | Victim, eight-month-old child and daughter of defendant's female roommate died from severe blows to the head administered by defendant while victim was in bathtub. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984), *cert. denied* ___ U.S. ___, 110 S.Ct. 3292, 111 L.Ed.2d 800 (1990). | Defendant and female co-defendant (Small) were traveling from California through Idaho planning to hitchhike through Montana or Canada, no further description of defendant provided. | Defendant repeatedly shot victim, a recent acquaintance, with .22 caliber pistol after driving to an abandoned gravel pit presumably for target practice, victim was also robbed and car was stolen. The killing was done in a cold-blooded and callous fashion, sole motive was monetary gain, victim shot in the body and killed, execution style. | Convicted of first-degree murder, conspiracy to commit murder, robbery, and conspiracy to commit robbery, death sentence imposed. | Affirmed. |

| Case | Mitigating/Aggravating Factors | Facts | Conviction/Sentence | Disposition |
|---|---|---|---|---|
| *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983), cert. denied 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984). | Member of Spokane motorcycle gang, no further description provided. | Male and female victims, who both were acquainted with co-defendants, were seen together before their van was later seen driving up a sparsely populated mountain road in Idaho. Three men were later seen leaving the sparsely populated area, including in the three men was defendant. The bodies of victims were later found. Male had been beaten severely around the head, female had been strangled and placed in a stream bed, it was determined that male was killed in Washington while female was killed in Idaho. Defendant was acquitted of the murder of male and extradited to Idaho for the murder of the female. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983), cert. denied 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984). | Extensive prior criminal record, capable of manipulation, remorse is questionable, background includes extensive use of drugs and/or alcohol, not able to cope with pressure and may act out against society again, dishonorable discharge from service, uncooperative while on prior probation. | See *Paradis* above, defendant acquitted in murder of male, extradited to Idaho for murder of female. | First-degree murder. Death penalty imposed. | Affirmed. |
| *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), cert. denied 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); 112 Idaho 197, 731 P.2d 192 (1986); 119 Idaho 320, 806 P.2d 413 (1990). | Defendant by prior conduct and conduct in the commission of the murder at hand has exhibited a propensity to commit murder which will probably constitute a continuing threat to society, defendant dominated his co-defendant, defendant had previously worked at the gas station and knew victim, had expressed prior animosity. | See *Bainbridge* above. Defendant was found to have delivered the death blows to victim. | Convicted of first-degree murder, robbery, possession of a firearm during commission of felony, death penalty imposed. | Sentence vacated on procedural grounds; remanded for resentencing. |
| *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), cert. denied 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). | Defendant previously convicted of other murders, exhibited utter disregard for human life, propensity to commit murder, under sentence for first-degree murder at the time of his actions. | While working as a janitor in prison, defendant engaged in argument with a fellow inmate. Defendant struck fellow inmate with sock containing batteries causing severe head injury and ultimate death of victim. | First-degree murder. Death penalty imposed. | Affirmed. |

| Case | | | | |
|---|---|---|---|---|
| *State v. Major*, 105 Idaho 4, 665 P.2d 703 (1983). | Married, two children, heroin user. | Defendant and male victim had been drinking together in a local bar, defendant and victim left and went to victim's home, the body of the victim was found approximately three days later in his home, victim died from multiple stab wounds including numerous slashes to the throat. Defendant and his wife fled to California, were later arrested and extradited to Idaho. | First-degree murder. Fixed life. | Affirmed. |
| *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336, *cert. denied* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983). | Wife of victim, user of prescription drugs and alcohol. | Although it was initially suspected that victim had been murdered by strangulation during a burglary of victim and defendant's home, defendant later convicted in the contract killing of her husband. | First-degree murder. Indeterminate life sentence. | Affirmed. |
| *State v. Olin*, 103 Idaho 391, 648 P.2d 203 (1982). | Defendant had a history of family and physical problems which inhibited his ability to learn, verbal skills tested in the dull normal range, I.Q. tested in the dull normal to high normal range, psychiatrist report indicated defendant was competent to stand trial, defendant had an aversion towards homosexuals. | Victim, a homosexual male, was stabbed 33 times, defendant claims victim made homosexual advances towards him, defendant took and sold some of the victim's property after the murder. | Convicted of grand larceny and first-degree murder. | Defendant appeals conviction for first-degree murder, affirmed, sentence not specified in opinion. |
| *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). | Employed at Pocatello cafe, co-worker of victim, seen together in hotel the day before murder and together in an automobile on the day of the murder. Evidence of intoxication on the day of murder, found competent to stand trial, history of antisocial behavior and alcohol/drug abuse. | Defendant and victim, a female co-worker, observed in hotel room the evening before the murder took place, stopped by police officer on the day of the murder after which the police officer instructed victim to drive the automobile because of defendant's intoxicated state, body of victim later found shot three times in the head, once in the shoulder and once in the abdomen, extensive bruising of face and fracture of her nose. Defendant later found in possession of a pistol with blood on his vest, chest and boots, blood in automobile, victim found partially clothed along side of a road. | Defendant pled guilty to first-degree murder, death penalty imposed. | Reversed and remanded for resentencing because of trial court's failure to specify in writing the mitigating factors it considered. |
| *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979). | Wife of victim, prior evidence of violent activity directed at victim. | Body of victim discovered partially burnt, without head and arms, wrapped in a bed sheet and covered by a door. Death of victim caused by either gun shots, decapitation, or a slit throat. | First-degree murder. Sentence of life imprisonment. | Affirmed. |

| *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979). | Very intelligent and educated, construction engineer, hired by former employer to kill his wife in order to collect insurance proceeds. | Lured victim to remote area under false pretext, beat victim on the head with a 2 × 4 wooden club, victim able to climb into the back of her car and lock the doors, defendant shot victim to death through the closed window of the car. | Death penalty imposed. Also found guilty of lesser included offense of second-degree murder. | Sentence and first-degree murder conviction set aside, second-degree murder conviction imposed, case remanded for re-sentencing because of unconstitutional language of statute requiring death penalty in first-degree murder cases. |